**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| GEORGE I. ROUMELIOTIS, CHAPTER | : | CIVIL ACTION NO. 23-1366 |
| 7 TRUSTEE FOR THE NASH | : | |
| ENGINEERING COMPANY, | : | |
| | : | **PLAINTIFF DEMANDS JURY TRIAL** |
| | : | |
| v. | : | |
| | : | OCTOBER 18, 2023 |
| | : | |
| MARK H. NORDENSON, EILEEN | : | |
| MAGUIRE, AND JOHN A. BLY | : | |

## COMPLAINT

### I.    INTRODUCTION

The Chapter 7 Trustee of the bankruptcy estate of The Nash Engineering Company ("TNEC" or the "Debtor"), brings this action against TNEC's former directors and officers ("Directors and Officers" or the "Defendants") for breaches of their fiduciary duties of loyalty and care in improperly distributing approximately $59 million in proceeds TNEC received from the sale of TNEC's assets to its sole shareholder, Nash Engineering Holdings LLC (for further distribution to former TNEC shareholders), at a time when TNEC was materially underinsured for its massive liabilities for asbestos bodily injury claims arising from thousands of individual claimants' exposure to TNEC's products.

The Trustee also asserts claims arising from the Directors and Officers' breaches of their fiduciary duties of loyalty and care by entering into a settlement agreement with one of TNEC's insurers to "buy back" excess insurance policies with coverage limits in excess of $52 million, and additional obligations to pay tens of millions of dollars in estimated defense costs, for a mere fraction of such limits. Through this settlement, the Directors and Officers improperly attempted to avoid a bankruptcy filing for TNEC and thereby shield themselves and Nash Holdings from a

13142024v1

bankruptcy trustee's investigation into, and claims based upon, TNEC's prior transactions with, and decisions exclusively favoring, Nash Holdings.  As alleged in detail further below, the Trustee is entitled to recover from the Directors and Officers the full amount of damages their breaches caused the Debtor and its creditors.

## II.   PARTIES

1.      TNEC is a Connecticut corporation with a principal place of business, on information and belief, at 73 South Street, Freeport, Maine, 04032.

2.      On October 19, 2021 (the "Petition Date"), TNEC filed a voluntary petition pursuant to Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut, which was assigned case number 21-50644 (the "Bankruptcy").

3.      On October 20, 2021, the Trustee was appointed as the Chapter 7 trustee of TNEC's bankruptcy estate.

4.      The Trustee maintains the right to bring and prosecute this action against the Defendants pursuant to 11 U.S.C. §§ 541 and 704.

5.      Defendant, Mark H. Nordenson, is an individual and a resident of the State of Maine.  Nordenson also served on the TNEC Board of Directors and as TNEC's Chief Executive Officer from at least 2004 through the Petition Date.

6.      Defendant, Eileen Maguire, is an individual and, on information and belief, a resident of the State of New York.  Maguire also served on the TNEC Board of Directors from 2013 through the Petition Date.

7.      Defendant, John A. Bly, is an individual and, on information and belief, a resident of the State of Texas.  Bly also served on the TNEC Board of Directors from at least 2004 through the Petition Date.

2

### III.   JURISDICTION AND VENUE

8.     This Court has jurisdiction over the Defendants in this action pursuant to 11 U.S.C. §1334(b) because this civil proceeding arises in or is related to a case under title 11.

9.     Defendants are each subject to personal jurisdiction in this District, pursuant to Conn. Gen. Stat. § 52-59b(a), because they served as directors or officers of TNEC, which was incorporated, operated and owned property in Connecticut.  As detailed more fully below, Defendants breached their fiduciary duties and caused injury to TNEC in Connecticut by, *inter alia*, stripping TNEC of the assets necessary to cover its liabilities and causing TNEC to file a certificate of dissolution with the Connecticut Secretary of State's Office in an improper attempt to dissolve TNEC pursuant to Connecticut law.  As a consequence of TNEC's dissolution and bankruptcy filings in Connecticut, along with the Directors and Officers' other conduct relating to TNEC's Connecticut assets and business activities as alleged herein, the Defendants should reasonably have expected that their actions would have harmful consequences in Connecticut.

10.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and 1409(c).

### IV.   FACTUAL ALLEGATIONS

#### A.  TNEC's Business.

11.     TNEC was founded in 1905 by Lewis Nash and its business primarily consisted of manufacturing liquid ring vacuum pumps used in various industries for vacuum steam heating systems, vacuum sewage collection systems, and to manufacture pulp and papers (the "Manufacturing Business").

12.     Lewis Nash and numerous other members of the Nash family were involved with the ownership and/or management of the Manufacturing Business continuously from 1905 through 2002, when the Manufacturing Business was transferred to Nash Elmo as alleged further

3

herein.

13.     Since at least 1991 through the Petition Date, TNEC has been a named defendant in tens of thousands of asbestos-related lawsuits throughout the United States in which claimants allege injuries or death resulting from exposure to asbestos contained in TNEC's products.

14.     According to TNEC's Statement of Financial Affairs, filed on November 2, 2021 in the Bankruptcy, TNEC was a party in over 1,600 asbestos-related cases currently pending throughout the United States.

### B.   TNEC's Shareholders and Transactions Relating to the Sale of the Manufacturing Business.

15.     From approximately 2002 through 2009, TNEC entered into a series of transactions through which it divested substantially all of its assets (the "Asset Sales") and distributed, through Nash Holdings, the proceeds of the Asset Sales to the Shareholders, all while new lawsuits for personal injury and/or wrongful death were filed against TNEC as thousands of individuals were diagnosed with asbestos disease they claimed was caused by exposure to asbestos contained in TNEC's products.

16.     In March 2002, TNEC entered into a series of transactions with Audax Private Equity Fund, L.P. ("Audax") (the "Audax Transactions") to combine TNEC's Manufacturing Business with the business of elmo vacuum technology GmbH, a subsidiary of Siemens AG. After the closing of the Audax Transactions, the combined business operated under the name "Nash Elmo."

17.     As a result of the Audax Transactions, TNEC owned approximately 35.75 percent of Nash Elmo, with Audax holding the entire remaining ownership interest.

18.     Thereafter, pursuant to a Merger Agreement dated on or about July 28, 2004,

13142024v1

between Nash Elmo and Gardner Denver, Inc. ("Gardner Denver"), Nash Elmo was merged into Gardner Denver (the "Gardner Denver Merger").

19.     At the time of the Gardner Denver Merger, TNEC's shareholders included, among others, over 100 members of the extended Nash family, including Defendants Nordenson and Bly, who owned various classes of preferred or common shares of TNEC either in their own names or through trusts for their benefit (the "TNEC Shareholders").

**C.   The Formation of Nash Holdings in Connection with the Gardner Denver Merger, the Stockholders' Exchange of TNEC Stock for Nash Holdings Membership Interests and the Defendants' Dual Roles with TNEC and Nash Holdings.**

20.     In connection with the Gardner Denver Merger, TNEC effected an internal reorganization and formed Nash Engineering Holdings LLC ("Nash Holdings").

21.     Upon the formation of Nash Holdings, and concurrent with the closing of the Gardner Denver Merger, all of the TNEC Shareholders, including Defendants Nordenson and Bly, became holders of the membership interests of Nash Holdings.  Specifically, each share of TNEC common and preferred stock was cancelled, and each holder thereof received an equivalent number of membership units of Nash Holdings with identical rights and restrictions to their prior stock interests in TNEC.

22.     Nash Holdings, in turn, became the sole owner of TNEC as of approximately July 2004 and remained TNEC's sole shareholder though the Petition Date.

23.     While Nordenson and Bly served as directors of TNEC from 2004 until the Petition Date, they also served on the board of managers (the equivalent of the board of directors for an LLC) for Nash Holdings for that entire period.

24.     While Maguire served as a director of TNEC from 2013 until the Petition Date, she also served on the board of managers for Nash Holdings for that entire period.

13142024v1

25.     While Nordenson served as Chief Executive Officer of TNEC from at least 2004 until the Petition Date, he also served as CEO for Nash Holdings for that entire period.

26.     In its capacity as TNEC's sole owner, Nash Holdings (through the Defendants as its directors) elected all of TNEC's directors, approved all of TNEC's business decisions and, ultimately, controlled all aspects of TNEC's affairs.  This control included, but was not limited to, the disposition of TNEC's assets, the distribution of TNEC's cash to Nash Holdings, the payment of TNEC's ongoing expenses, maintaining TNEC's relations with its product-liability insurers and defense counsel, orchestrating TNEC's dissolution in April 2020, and initiating TNEC's voluntary bankruptcy filing in October 2021.

**D.  TNEC's Receipt of Over $59 Million from the Asset Sales and Transfer of those Proceeds to Nash Holdings.**

27.     Pursuant to the Gardner Denver Merger, Gardner Denver acquired the entirety of TNEC's 35.7 percent ownership interest in Nash Elmo, resulting in gross sale proceeds to TNEC in excess of $59.7 million.

28.     Upon information and belief, after payment of certain loan obligations and other amounts due at closing, TNEC received net proceeds of approximately $44.6 million (the "Merger Proceeds") from the sale of its interest in Nash Elmo.

29.     Following the Gardner Denver Merger, TNEC's remaining assets consisted of certain real estate it leased on a short-term basis to Gardner Denver (the "Real Estate"), cash, and certain life insurance policies, which TNEC had previously purchased to insure the lives of certain TNEC executives and under which TNEC was a beneficiary (the "Life Insurance Policies").

30.     Between approximately 2006 and 2009, TNEC sold all of its remaining Real

13142024v1

Estate and liquidated the remaining Life Insurance Policies.

31.     According to TNEC's records, and as confirmed by Defendant Mark Nordenson at the Section 341 Meeting of Creditors conducted by the Trustee, TNEC transferred to Nash Holdings substantially all of the Merger Proceeds it received from the Gardner Denver Merger.

32.     TNEC also distributed to Nash Holdings substantially all of the proceeds from the sales of the Real Estate and from the sale of the Life Insurance Policies.

33.     From 2004 through 2011, TNEC transferred a total of approximately $59,720,000 to Nash Holdings (the "Nash Holdings Transfers").

34.     Upon information and belief, upon receiving the Nash Holdings Transfers from TNEC, Nash Holdings further distributed substantially all of those funds to various Nash Holdings members (who, as noted above, were the former direct shareholders of TNEC).

35.     TNEC did not receive any consideration from Nash Holdings in exchange for the Nash Holdings Transfers.

36.     Upon completion of the Nash Holdings Transfers in 2011, and for the next approximately ten (10) years continuing through the Petition Date, TNEC held no cash in its own name.

37.     After TNEC transferred all of its cash to Nash Holdings, TNEC's sole activity was to facilitate processing of its asbestos liability claims through insurance policies it owned at the time of the Asset Sales until such policies were depleted.

**E.     TNEC's Insufficient Policy Limits Relative to its Substantial Asbestos Liability Claim Exposure as of the Dates of the Nash Holdings Transfers.**

38.     At the time of all of the Nash Holdings Transfers, TNEC was materially underinsured relative to its substantial current and future asbestos liability.

7

**1) TNEC's 1991 Settlement with The Hartford and TNEC's Insolvency after the Nash Holdings Transfers.**

39.     Indeed, years prior, in 1991, TNEC entered a settlement agreement (the "1991 Settlement") with the Hartford Insurance Company ("The Hartford") concerning TNEC's primary insurance coverage under policies purchased over the course of at least several decades from The Hartford.

40.     Through the 1991 Settlement, TNEC released all claims to primary policy coverage, except under ten specified primary policies issued by The Hartford, in exchange for The Hartford's agreement to pay out defense costs and a fixed aggregate amount for indemnity under those ten primary policies in connection with asbestos claims against TNEC.

41.     In light of the limited insurance coverage available after the 1991 Settlement and unfavorable developments for policyholders under Connecticut law in 2003, the interests of TNEC and its creditors required retention of sufficient proceeds from the Asset Sales to ensure that TNEC had sufficient funds to pay TNEC's share of indemnity and defense expenses in connection with asbestos claims against TNEC and that it would have adequate funds to vigorously enforce its rights against its insurers and, thus, maximize the value of its remaining insurance assets.

42.     When each of the Nash Holdings Transfers occurred, TNEC knew or should have known that the liabilities it faced from asbestos claims far exceeded its assets, including potential insurance coverage for such liabilities.

43.     TNEC nonetheless distributed substantially all of the Asset Sale proceeds to Nash Holdings for its benefit and the benefits of its members—members with whom TNEC's Directors and Officers were associated either through family relations in the case of Nordenson and Bly or

13142024v1

in a separate fiduciary capacity in the case of Maguire, as she served as one of Nash Holdings' managers.

44.     As a result of the Nash Holdings Transfers, TNEC was insolvent and/or was rendered insolvent as (1) it was not able to pay its debts as they became due in the usual course of business and (2) its total assets were less than the sum of its total current and reasonably foreseeable future liabilities arising from asbestos claims.

45.     TNEC's insolvency continued uninterrupted from the dates of the Nash Holdings Transfers until the Petition Date.

**2)     TNEC's 2018 Settlement with The Hartford.**

46.     In 2018, TNEC entered a second settlement with The Hartford whereby it released all claims for coverage under umbrella and excess policies sold by The Hartford and its affiliates in exchange for The Hartford's agreement to pay out a fixed aggregate amount for indemnity and defense expenses in connection with asbestos claims against TNEC (the "2018 Settlement").

47.     Following the 1991 Settlement and the 2018 Settlement, it was critically important for TNEC to maximize its remaining umbrella and excess policies because those policies were going to be the only policies left to provide defense and indemnity coverage for asbestos claims against TNEC.  Even with its limited remaining insurance coverage, however, all of TNEC's assets – including the amounts distributed through the Nash Holdings Transfers – should have been retained to cover TNEC's share of the indemnity and defense expenses in connection with the asbestos claims.

13142024v1

### 3) TNEC's Chubb Settlement.

48.     TNEC had four umbrella policies issued by Chubb,[1] which TNEC turned to in 2019 when the amounts provided by the 1991 and 2018 Settlements with The Hartford were exhausted.

49.     The Chubb policies together totaled $52 million in aggregate limits.  None of the Chubb policies contained any asbestos exclusions.  The Chubb policies provided that the costs of defending asbestos claims against TNEC were in addition to the aggregate limits of the policies, such that defense cost payments did not reduce each policy's limits on indemnity available to settle claims or pay judgments on behalf of TNEC.

50.     According to information known or reasonably available to TNEC, defense costs had historically comprised in excess of fifty percent of the average amount of indemnity payments (through settlements or otherwise) to asbestos claimants.

51.     Thus, as of 2020, TNEC knew or should have known that the full amount of Chubb's monetary exposure under the terms of the Chubb policies was not less than approximately $78 million (the "Potential Policy Payment Amount").  This figure is based on Chubb's obligation under the policies to indemnify TNEC for verdicts and settlements of asbestos claims up to the $52 million in policy limits, plus at least $26 million (using a conservative ratio of defense costs to indemnity of fifty percent, which is still below TNEC's historic experience) in defense costs.

---

[1]     The policies were issued specifically in the names of Chubb affiliates as follows: Century Indemnity Company, as a successor to CIGNA Specialty Insurance Company (formerly known as California Union Insurance Company), Federal Insurance Company and Pacific Employers Insurance Company.

13142024v1

52.     Chubb did not dispute the existence of the Chubb policies, nor did it dispute the obligation, at some point, to make payments under the policies.  However, by 2020, Chubb was disputing the timing and extent of its payments relative to other potentially available policies and relative to TNEC's own funding obligations.

53.     In April 2020, in response to Chubb's stated positions regarding the extent and timing of certain payments under its policies, TNEC settled the dispute by agreeing that Chubb could "buy back" TNEC's interests in all known and unknown Chubb policies, with the policies, thereafter, no longer being in effect (the "Chubb Settlement").

54.     As part of the Chubb Settlement, TNEC agreed to effect is own corporate dissolution in Connecticut under Conn. Gen. Stat. § 33-887.

55.     The Chubb Settlement required Chubb to pay a maximum of $14,350,000 toward past and future defense and indemnity expenses for asbestos claims asserted against TNEC before the end of the three-year dissolution period.

56.     Before agreeing to the Chubb Settlement, TNEC did not perform or obtain its own analysis or modeling of future exposure for potential indemnity and defense costs in connection with asbestos claims that had already accrued based on exposure to TNEC products but would be asserted in the future, whether during the three-year dissolution period or thereafter.  Indeed, in an email dated December 17, 2020, TNEC was asked by counsel to Gardner Denver in connection with the Chubb Settlement: "Does TNEC have any analysis of future exposure?" TNEC's counsel responded: "TNEC does not have an analysis of future exposure."

57.     Nonetheless, before agreeing to the Chubb Settlement in April 2020, TNEC had information available to it that confirmed that for at least the two and a half year period from May 2017 through October 2019, the defense and indemnity payments under The Hartford

policies for pending asbestos claims were averaging over $6,700,000 on an annualized basis.

58.     TNEC also knew before agreeing to the Chubb Settlement that TNEC's national coordinating counsel had provided an aggregate indemnity budget for 2020 of $6.0 million together with a $4.4 million defense budget, for a total of $10.4 million of budgeted funds needed for 2020 to address the then-known asbestos claims against TNEC.

59.     TNEC also knew before agreeing to the Chubb Settlement that over time, the number of asbestos lawsuits had continued to accelerate and the settlement amounts had escalated.

60.     TNEC thus knew or should have known that a $14.35 million Chubb Settlement amount would not come close to satisfying the reasonably foreseeable indemnity and defense costs in connection with asbestos claims.

### 4) The Amount of the Chubb Settlement was Woefully Inadequate.

61.     The Directors and Officers nonetheless approved the Chubb Settlement and agreed to relinquish TNEC's rights under the Chubb policies in exchange for a value of less than twenty percent of the Potential Policy Payment Amount.

62.     Not surprisingly, the amount of the Chubb Settlement quickly proved woefully insufficient to address asbestos claims and the associated defense costs during the dissolution period.  By November 2020, a little more than six months into the settlement, Chubb had paid or authorized defense and indemnity payments of approximately $6,000,000, or over forty percent of the total settlement amount.

63.     As Mark Nordenson confirmed in a November 12, 2020 email: "The settlement agreement was $13M plus $1.35[M] so remaining is $8.15[M] if all authority extended is paid. Clearly likely not enough to get to April 2023 unless the burn 🔥 is reduced greatly."

13142024v1

64.     Thereafter, the burn rate was not "reduced greatly."  Quite to the contrary, by August, 2021, less than fifteen months into the three year dissolution period, only approximately $3,000,000 of the amount available under the Chubb Settlement remained.  This led Eileen Maguire to confirm in an August 24, 2021 email:  "At this rate, assuming we are unable to get additional coverage from Resolute, Allstate and/or Chubb, TNEC will not be able to complete the three year dissolution period."

65.     At no point before entering the Chubb Settlement did TNEC or the Directors and Officers receive any confirmation, or even suggestion, from Resolute, Allstate or Chubb that those insurers would provide additional coverage to TNEC for any period.

66.     As the Directors and Officers could have and should have predicted based on the recent past indemnity and defense expenses and increase in claims activity, the burn rate on the Chubb Settlement funds continued to accelerate.  By September 30, 2021, Chubb reported to TNEC: "These are the financials as of 9/30/21: $11,257,379 paid ($6,412,220 in indemnity and $4,845,159 in expense)[.] We anticipate having less than $1M in remaining limits by year end 2021."

67.     Thus, far from having sufficient insurance coverage through the three year dissolution period, TNEC was projected to deplete the entire Chubb Settlement amount approximately half-way through, in large part because it had released Chubb from any further coverage and payment obligations.

68.     The Directors' decision to agree to the Chubb Settlement suffered from at least three fundamental failures of reasonable inquiry or reliance: (1) it was not reasonably based on the known recent defense and indemnity expenses of over $6.7 million per year; (2) it was made without TNEC seeking or performing its own analysis or modeling of potential future claims and

13

associated expenses; and (3) it was limited to a three-year period even though the Directors knew that there would likely be thousands more claims made against TNEC after the three year dissolution period and that the $52 million total Chubb policy limits, plus the payment of defense costs on top of those limits, could be available to provide coverage for a far greater number of asbestos claimants' claims than would be covered by the Chubb Settlement.

> **5) The Directors and Officers Pursued the Chubb Settlement and the Associated Dissolution Based on Nash Holding's Best Interests.**

69.     The decision to attempt to dissolve TNEC over a three year period, rather than continue in existence until the entire face amounts of the Chubb policies, plus any other available policies, were exhausted or to file for bankruptcy if there were insufficient proceeds available, was not consistent with, or even focused on, the best interests of TNEC or its creditors.  Instead, the decision to dissolve TNEC was made in order to protect Nash Holdings', and the Nash family members', interests as TNEC's shareholders.

70.     As Mark Nordenson confirmed in a March 20, 2020 email to Chubb during the negotiations of the Chubb Settlement:

> As you know, our primary objective of the settlement with Chubb and subsequently with other identified insurers is for The Nash Engineering Company ("TNEC") and its parent Nash Engineering Holdings LLC ("NEH") to completely wind up both entities' affairs through an orderly dissolution of TNEC and eventual liquidation of NEH in compliance with applicable laws and contractual agreements. This process has been going on for the last 16 years and will conclude after almost 20 years, given the 3 year dissolution process of TNEC under Connecticut law.

71.     Nordenson reiterated his singular focus on the interests of Nash Holdings in a March 27, 2020 email to Chubb, where he wrote:

> Again, it's important to remember that Nash's objective since the sale of its entire ownership in an operating business in 2004 has been to liquidate all of its assets and distribute the proceeds to its family shareholders. We are now in the 16th year of this process. In the meantime, the company has tried to utilize its product liability insurance

coverage it purchased and paid for in full over many years to settle claims made against it by plaintiffs alleging exposure to asbestos used in Nash products.

72.     At the time the Chubb Settlement was negotiated and executed in late 2019 through early 2020, TNEC was insolvent.  Specifically, it held no cash and had no assets in its own name except for the liability insurance policies, through Chubb and other insurers, that provided coverage for asbestos claims.  Even as to the face value of the policies, the likely future indemnity and defense expenses were reasonably likely to far exceed the policy limits.  Given this financial reality, TNEC should have been singularly focused on maximizing the available insurance limits, as the Directors and Officers owed a fiduciary duty to TNEC and its creditors.

73.     Instead, the Directors and Officers effectively gave away most of TNEC's remaining coverage.  This left the existing and future creditors without any recourse to insurance that TNEC previously had purchased and relied upon to address asbestos claimants' claims.  Knowing that it also had previously attempted to deprive TNEC and its creditors of the approximately $59 million in Asset Sale proceeds by transferring those funds to Nash Holdings, the Directors opted to leave the existing creditors without financial recourse.

74.     Through the three year planned dissolution process, the Directors also evidenced an explicit disregard for known and reasonably foreseeable future asbestos claimants.  The only concern TNEC had was getting through a three year period and thereby denying TNEC and its creditors any ability to administer and pay for the creditors' continuing claims.

**6)  TNEC's Directors' refusal to pursue bankruptcy due to the risks to Nash Holdings.**

75.     By the time it had decided to embark on the ill-fated dissolution effort, TNEC's Directors had specifically considered and rejected a more orderly marshalling of assets and liquidation through a bankruptcy filing.

13142024v1

76.     To that point, the Directors received advice on the risks of a bankruptcy filing through a January 16, 2020 memorandum, which advised the Directors, in relevant part, as follows:

I. POTENTIAL OUTCOMES FOR TNEC

**A.  Bankruptcy (Chapter 7)**

**B. Dissolution**

. . .

II. ALL OF THE FOREGOING OPTIONS PRESENT RISKS/CHALLENGES, CERTAIN OF WHICH ARE IDENTIFIED BELOW FOR FURTHER CONSIDERATION

**A. Bankruptcy (Chapter 7)**

1. Uncertainty as to outcome.
2. Potential litigation by various parties against NEH [(Nash Holdings)], Hartford, TNEC directors and/or officers, others.
3. Plaintiffs' lawyers and bankruptcy Trustee looking for any/all potential assets.
4. If plaintiffs' lawyers and/or bankruptcy Trustee pursues Chubb coverage (or any other TNEC coverage), TNEC's insurers may sue Hartford, in which case, Hartford would likely pursue TNEC for indemnification.
5. If TNEC pursues chapter 7, it should do so without cash available to fund the bankruptcy Trustee's search for assets and having received releases from the insurers.
. . .

77.     After considering the various options, and in light of the risks to Nash Holdings and the Directors and Officers personally, the Directors opted to pursue a potential dissolution, in order to protect Nash Holdings' and the Directors' own interests in avoiding claims against them in a bankruptcy scenario.

78.     Even where they recognized in passing the possibility of a bankruptcy filing, it was only in a situation where TNEC was "without cash available to fund the bankruptcy Trustee's search for assets."

13142024v1

**7) TNEC's Eventual Bankruptcy.**

79.     At the time TNEC was negotiating the Chubb Settlement, it also held additional insurance consisting of umbrella policies with aggregate limits of $12 million issued by Northbrook Insurance Company, Columbia Casualty Company ("CNA") and Stonewall Insurance Company ("Stonewall") and Allstate (collectively, the "Additional Insurers").

80.     In the Chubb Settlement, TNEC and Chubb referenced the Additional Insurers' policies as potential additional sources of coverage.  However, the Additional Insurers never committed to even negotiate any payment under their policies, let alone provide TNEC any coverage.

81.     Notwithstanding the lack of any Additional Insurers' participation, and the obvious insufficiency of the Chubb Settlement payment amount, TNEC proceeded with the Chubb Settlement and the dissolution process in order to start the three-year period after which future creditors' claims would be barred without the risks to Nash Holdings and the Directors of a TNEC bankruptcy filing.

82.     In August 2021, CNA and Stonewall, brought a declaratory judgment action[2] asserting their denial of coverage positions.

83.     TNEC, having been depleted of any funds by the Directors and Officers' prior decisions and transactions in connection with the Nash Holdings Transfers, lacked the resources to defend against this lawsuit and prosecute the necessary counterclaim to obtain coverage.

84.     This led to TNEC's bankruptcy filing on October 19, 2021.

---

[2]     This action was brought in the United States District Court, District of Connecticut (3:21-cv-01075-RNC).

13142024v1

### V.   ANY APPLICABLE STATUTES OF LIMITATION WERE TOLLED

#### A. Continuing Course of Conduct.

85.     The Directors and Officers' breaches of their fiduciary duties date back to at least 2004 when they began distributing Asset Sale proceeds to Nash Holdings through the Nash Holdings Transfers.  These Transfers were made solely for the benefit of Nash Holdings and to the detriment of TNEC.  TNEC also was insolvent as a result of the Nash Holdings Transfers.  Thereafter, TNEC did nothing to try to recoup the amounts of the Nash Holdings Transfers in order to preserve and maximize TNEC's assets to address its substantial liabilities.

86.     Throughout the entire period from 2004 onward, the Directors and Officers owed continuing fiduciary duties to act in the best interests of TNEC and its creditors, which necessarily included maximizing and retaining TNEC's assets, including but not limited to all funds comprising the Nash Holdings Transfers, to address TNEC's substantial liabilities.

87.     Nevertheless, the Directors and Officers continuously breached their fiduciary duties to TNEC and its creditors for at least a seventeen-year period from 2004 until the Petition Date, by improperly distributing all of TNEC's cash to Nash Holdings, failing to take any steps to recover those improper distributions, and wasting the majority of the policy proceeds available under the Chubb policies by entering into the Chubb Settlement without any reasonable belief that such a settlement was in the best interests of TNEC or its creditors.

88.     Throughout the entire period from 2004 through 2021, the Directors and Officers continuously acted solely in the interests of Nash Holdings in connection with Nash Holdings' receipt of all of TNEC's assets.  The Directors and Officers also refused to consider a bankruptcy filing in light of the risks of investigations and claims against Nash Holdings and the Directors and Officers.  Instead, they opted to pursue a fruitless dissolution option in which they hoped that

18

TNEC could make it through a three year dissolution period and thereafter cut off any claimant's ability to challenge the Nash Holdings' Transfers or the Directors and Officers' conduct.

89.     Each of the foregoing acts or omissions, individually and collectively, were part of the same improper practice and pattern of conduct by the Defendants in favoring the interests of Nash Holdings over the interests of TNEC and its creditors.

90.     Because any investigation into the impropriety of the Directors and Officers' wrongful conduct and breaches of fiduciary duty alleged herein necessarily would have implicated the Directors and Officers, none of them had any interest in pursuing, nor any incentive to pursue, any such claims on TNEC's behalf.

91.     It was not until the Trustee was appointed in connection with this bankruptcy case that a disinterested and independent party with sufficient decision-making authority was in place to take steps necessary to protect TNEC's interests in enforcing its rights against the Directors and Officers with respect to their breaches of fiduciary duties in connection with the Nash Holdings Transfers, the Chubb Settlement, and the Directors and Officers' continuous improper pursuit of Nash Holdings' interests to the exclusion of TNEC's and its creditors' interests.

92.     Thus, the statute of limitations was tolled until at least the Petition Date, if not later, and the present action was timely brought within the statutory period set forth in 11 U.S.C. § 108.

### B. Fraudulent Concealment (General Statutes § 52-595).

93.     The Directors and Officers had actual knowledge of the facts necessary to establish the various breaches of their fiduciary duties.  Specifically, the Directors and Officers knew that transferring to Nash Holdings substantially all of the proceeds of the Asset Sales was not in the best interests of TNEC and its creditors, but rather was done for the sole benefit of

13142024v1

Nash Holdings, as TNEC's sole shareholder.

94.     The Directors and Officers also knew or should have known that the Chubb Settlement would not provide sufficient funds to satisfy both current and reasonably foreseeable future asbestos claimants, and thus would leave TNEC's creditors with asbestos injuries without any financial recourse.

95.     Furthermore, the Directors and Officers intentionally delayed filing for bankruptcy, even though it would have been in the best interests of TNEC to do so earlier, so as to limit the likelihood that the Directors and Officers would be held liable for their conduct or that any independent fiduciary would investigate and attempt to recover the Nash Holdings Transfers.

96.     The Directors and Officers intentionally concealed these facts from TNEC's creditors and actively avoided filing a bankruptcy petition, which prevented any independent fiduciary, such as the Trustee, from discovering these facts.  In addition, because both TNEC and Nash Holdings are private companies, and no details were shared or made available to TNEC's creditors, the Nash Holdings Transfers were not subject to public disclosure and, in this way, were self-concealing.

97.     The Directors and Officers intentionally concealed these material facts even though they owed fiduciary duties to TNEC's creditors and were obligated to consider the creditors' interests in maximizing the value of TNEC's assets.

98.     The Directors and Officers concealed the facts establishing their various breaches of fiduciary duties for the purpose of obtaining delay in the filing of these causes of action.

99.     The facts giving rise to the Directors and Officers' various breaches of fiduciary duties remained concealed until after the Bankruptcy was filed and the Trustee was able to access

records and other information concerning the acts and transactions alleged herein.  TNEC's creditors remained in ignorance of these facts until this time without any fault or want of diligence on their part.

100.     Thus, the statute of limitations was tolled until at least the Petition Date, if not later, and the present action was timely brought within the statutory period set forth in 11 U.S.C. § 108.

## VI.     CLAIMS FOR RELIEF

### COUNT I – Breach of Fiduciary Duty of Loyalty– Nordenson and Bly as Directors
### (Based on Nash Holdings Transfers)

101.     The Trustee incorporates by reference each and every allegation set forth above as if fully recited herein.

102.     From 2004 through 2011, at a time when they were directors of TNEC, Nordenson and Bly were also managers (the equivalent of directors for an LLC) of Nash Holdings. Nordenson and Bly, along with approximately 100 or more of their extended family members also were members (the equivalent of shareholders for an LLC) of Nash Holdings, having previously been shareholders of TNEC before the 2004 Gardner Denver Merger.

103.     As directors of TNEC during a time in which TNEC was insolvent, Nordenson and Bly owed both TNEC and its creditors a duty of loyalty, which required them to perform their directorial obligations in good faith and with a view toward solely promoting the interests of TNEC and its creditors and not their own, their family members' or Nash Holdings' interests.

104.     Throughout the period from 2004 through 2011 when they served as directors of TNEC, Nordenson and Bly controlled the management and finances of TNEC and directed or allowed all of TNEC's remaining cash to be transferred to Nash Holdings for later distribution

21

to Nash family members.  Nordenson and Bly did so in dereliction of their duties as directors of TNEC.

105.    By funneling all of TNEC's remaining cash to Nash Holdings, Nordenson and Bly allowed TNEC to be operated for the sole benefit of Nash Holdings and the Nash family members, including Nordenson and Bly individually, without regard for TNEC's financial or operational needs and without regard for the interests of TNEC's creditors.  Specifically, through the Nash Holdings Transfers, TNEC was left without sufficient assets to pay defense or indemnity obligations in connection with asbestos claims after 2011, once available insurance policy proceeds were no longer available.

106.    Nordenson and Bly did not act independently or disinterestedly when they directed, authorized or allowed the above transactions to occur, nor did they base their decisions on the best interests of TNEC or its creditors.

107.    Instead, throughout their tenure as directors of TNEC, and specifically during the period from 2004 through 2011, Nordenson and Bly based all of their decisions with respect to the management and operations of TNEC, including allowing the Nash Holdings Transfers, solely upon their interests in and ties and allegiance to Nash Holdings and the Nash family member shareholders.

108.    Indeed, throughout their tenure as directors of TNEC after 2004, Nordenson and Bly maintained managerial positions with Nash Holdings, in which capacities they were charged with carrying out the business purpose, and otherwise serving the interests of, Nash Holdings. Nash Holdings existed solely as a vehicle to extract all the available cash from TNEC and, thereafter, to distribute those funds to Nash family members for their own use and benefit.

Nordenson and Bly thus allowed their duty of loyalty to TNEC to be compromised by their numerous and long-standing roles as owners and controllers of Nash Holdings and by their familial relationship with the Nash family shareholders.

109.    Nordenson and Bly's dual roles with TNEC and Nash Holdings were in conflict. The transactions undertaken or authorized by Nordenson and Bly, including, but not limited to, each of the Nash Holdings Transfers, conferred no benefit whatsoever upon TNEC and were entirely unfair to TNEC and its creditors.

110.    By acting or failing to act solely based on their allegiance to and interests in Nash Holdings and the Nash family shareholders, by failing to remain independent from Nash Holding's influence in acting as directors of TNEC, and by failing to make business decisions with a good faith belief that those decisions were in the best interests of TNEC and its creditors, Nordenson and Bly breached their duty of loyalty to TNEC and its creditors.

111.    As a result of the above-described breaches of Nordenson's and Bly's fiduciary duty of loyalty, TNEC and its creditors have been damaged in an amount to be determined at trial, but believed to be in excess of the $59,000,000 in Nash Holdings Transfers that Nordenson and Bly, as directors of TNEC, allowed to be transferred from TNEC to Nash Holdings – and never to be repaid – between 2004 and 2011.

13142024v1

## COUNT II – Breach of Fiduciary Duty of Care– Nordenson and Bly as Directors
## (Based on Nash Holdings Transfers)

112.     The Trustee incorporates by reference each and every allegation set forth above as if fully recited herein.

113.     As directors of TNEC between 2004 and 2011, Nordenson and Bly, individually and collectively, were charged with planning for and managing the continuing operations of TNEC's business.  The Defendants also had a duty to monitor TNEC's financial condition and were ultimately responsible for ensuring that the Company was managed with the best interests of TNEC and its creditors in mind.

114.     Throughout the entire time they were directors of TNEC, the Defendants owed a fiduciary duty to perform their duties in a manner they reasonably believed to be in the best interests of the company and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under the circumstances.

115.     Because TNEC either was insolvent as of the date of each of the Nash Holdings Transfers or was rendered insolvent by those Transfers, the Defendants, as directors, owed fiduciary duties not only to TNEC, but to its creditors as well.

116.     The Defendants, individually and collectively, breached their duty of care by authorizing, directing or allowing over $59 million in TNEC's funds to be transferred to Nash Holdings, with the knowledge that: (a) these transfers were unrelated to TNEC's legitimate continuing business interests and activities; (b) Nash Holdings would further distribute substantially all of the Nash Holdings Transfers to third parties (notably various insiders, including Nash family members), thus depriving TNEC of the ability to easily recoup the Nash Holdings Transfers; and (c) TNEC therefore would have no ability to use these funds to pay for

13142024v1

indemnity expenses and defense costs incurred in connection with claims by asbestos claimants in connection with TNEC's continued business operations.

117.    With this this knowledge, Defendants could not reasonably have believed the Nash Holdings Transfers to be in the best interests of TNEC or its creditors.

118.    Defendants also breached their duty of care by failing to prevent TNEC's officers, including Nordenson as TNEC's CEO, from overseeing and implementing the use of TNEC's funds for purposes other than TNEC's business purposes and from wrongfully transferring TNEC's funds for Nash Holdings' sole benefit.

119.    The transfer and use of TNEC's funds for purposes unrelated to TNEC's business would have led any reasonably informed director who was attempting to discharge his fiduciary duties with the due care required under the circumstances and who was acting in the best interests of the Company and its creditors to take steps to prevent the irreparable damage to the Company and its creditors that was inevitable as a result of the Nash Holdings Transfers.

120.    Instead of taking any actions to properly retain TNEC's proceeds from the Asset Sales and to discharge their fiduciary duty of care upon the knowledge that distributing these proceeds would leave TNEC unable to satisfy its obligations to ongoing asbestos claimants, Defendants did absolutely nothing to compel the return of the Nash Holdings Transfers for the benefit of TNEC or its creditors.

121.    As a result of Nordenson's and Bly's breach of their duty of care in the management and control of TNEC between 2004 and 2011, TNEC caused over $59,000,000 of TNEC's funds to be transferred to Nash Holdings, leaving TNEC with $0 in cash from 2012 onward.

122.    Defendants' authorization of or failure to prevent the Nash Holdings Transfers,

their failure to monitor the management of TNEC, their failure to take any steps necessary to maximize the availability of funds for pending and future asbestos claims, and their failure to take any steps to reclaim the Nash Holdings Transfers when it was obvious that Nash Holdings, as TNEC's sole shareholder, had improperly received funds ahead of TNEC's creditors at a time when TNEC was insolvent or rendered insolvent as a result of the Nash Holdings Transfers, all constituted gross negligence and a violation of the Defendants' duty of due care to TNEC and its creditors.

123.    Defendants' breaches of their fiduciary duty of care in authorizing or allowing the Nash Holdings Transfers left TNEC with insufficient funds to pay pending and future asbestos claims and ultimately left TNEC with no choice but to seek bankruptcy protection as a result of its inability to pay its debts when due.

124.    As a result of the above-described breaches of Defendants' fiduciary duty of care, TNEC and its creditors have been damaged in an amount to be determined at trial, but believed to be in excess of the $59,000,000 of the Nash Holdings Transfers that Nordenson and Bly approved and authorized, as Directors, between 2004 and 2011.

### COUNT III – Breach of Duty of Loyalty – Nordenson, Maguire and Bly as Directors and Nordenson as Officer (Based on Chubb Settlement)

125.    The Trustee incorporates by reference each and every allegation set forth above as if fully recited herein.

126.    Nordenson, Maguire and Bly, the three Directors of TNEC, were also the three directors of Nash Holdings.  Nordenson was the CEO of TNEC and also was the CEO of Nash Holdings.

26

13142024v1

127.    Given TNEC's insolvency, TNEC's Directors and Officers owed a fiduciary duty of loyalty to TNEC and its creditors and they were obligated to act in TNEC and its creditors' interest in maximizing the value of TNEC's assets, including but not limited to its insurance policies, for the purpose of satisfying current and future asbestos claims.

128.    In their roles as Nash Holdings' directors and officers, Defendants had an interest in acting to promote Nash Holdings' interests in connection with the Chubb Settlement and TNEC's dissolution.

129.    In this regard, the Directors and Officers caused the improper dissipation of TNEC's insurance assets through the Chubb Settlement in order to accelerate the time when TNEC would no longer have the resources to continue to respond to asbestos creditor claims and when later creditors would be barred from pursuing any claims against TNEC. The Directors and Officers did so even though the Chubb policies' indemnity limits and the additional defense costs outside of policy limits should have been maximized to defend and indemnify the asbestos claims.

130.    The Directors also delayed a bankruptcy filing as long as possible, in an effort to use the passage of time to attempt to insulate Nash Holdings and themselves from investigation into, and liability for, their improper handling of TNEC's assets and breaches of fiduciary duty to TNEC and its creditors.

131.    The Directors and Officers' dual roles and interests as TNEC's and Nash Holdings' directors were in conflict. The Directors and Officers nonetheless based their decisions to enter the Chubb Settlement, to dissolve the Debtor and to delay any bankruptcy filing upon

13142024v1

their own and Nash Holdings' interests rather than upon the interests of TNEC and its creditors. Such conduct constitutes a breach of their duty of loyalty to TNEC and its creditors.

132.    The Chubb Settlement and the associated dissolution process that the Directors and Officers authorized and pursued conferred no benefit whatsoever upon TNEC and were entirely unfair to TNEC and its creditors.

133.    The Directors and Officers' breaches of their fiduciary duty of loyalty caused TNEC and its creditors to suffer damages in an amount to be determined at trial, but believed to be in excess of the estimated $63,000,000 of indemnity and defense costs that TNEC abandoned in connection with the Chubb Settlement while acting exclusively to advance and protect Nash Holdings' interests.

134.    All of the Directors and Officers are liable to the Trustee for all damages arising from their breaches of their fiduciary duty of loyalty to the Debtor and its creditors.

**COUNT IV – Breach of Fiduciary Duty of Care (General Statutes § 33-765(a))
– Nordenson as TNEC CEO
(Based on Chubb Settlement)**

135.    The Trustee incorporates by reference each and every allegation set forth above as if fully recited herein.

136.    In his officer role with the Debtor as its CEO, Nordenson was principally involved with and responsible for the direct discussions and negotiations with Chubb regarding the Chubb Settlement.

137.    As the corporate officer directly responsible for carrying out the Debtor's business plan and ensuring that its assets were used consistently with that plan, Nordenson knew or could reasonably have ascertained based on available information or resources: (1) the historic amount

of pending claims against the Debtor, both by volume of claims and estimated dollar value; (2) the magnitude of the Debtor's overall asbestos liability including estimates of claims that would be filed in the future; (3) the $52,000,000 indemnity amount available under the Chubb policies; (4) the Debtor's additional entitlement to payment of substantial defense costs of future claims outside of the limits of the Chubb policies; (5) that settling with insurers for less than the value of outstanding coverage, in combination with dissolution of the Debtor under the Connecticut statute, would have a devastating effect on the Debtor's creditors by leaving them unpaid and without legal recourse; and (6) that under the circumstances faced by the Debtor, an immediate chapter 7 filing represented the best and only available course to maximize the value of the Debtor's assets for the benefit of its creditors.

138.    Knowing all that, and more, about the certain harm to the Debtor and its creditors from depletion of insurance proceeds, Nordenson nonetheless agreed to allow Chubb to buy back the Chubb policies for less than one-fifth of the Potential Policy Payment Amount.

139.    Given TNEC's insolvency, Nordenson, as TNEC's officer, owed a fiduciary duty of care to TNEC and its creditors, including the duty to preserve and maximize the value of all available insurance proceeds to cover asbestos claims against TNEC and the associated defense costs.

140.    No corporate officer acting with the care, including reasonable inquiry, skill and diligence, that a person of ordinary prudence would use under the circumstances would have, or could have, believed in good faith that the Chubb Settlement was in the best interests of the Debtor or its creditors.

13142024v1

141.    As a consequence of Nordenson's ill-informed and reckless decision, the Debtor was left more severely under-insured than before, all at a time when the Debtor was already insolvent.

142.    As a result of the above-described breaches of Nordenson's fiduciary duty of care as the Debtor's CEO, TNEC and its creditors have been damaged in an amount to be determined at trial, but believed to be in excess of the estimated $63,000,000 of indemnity and defense costs that TNEC abandoned in connection with the Chubb Settlement.

143.    Nordenson, as TNEC's officer and CEO, is therefore liable to the Trustee for all damages arising from his breach of his duty of care.

### COUNT V – Breach of Fiduciary Duty of Care (General Statutes § 33-756(a)-(b)) – Mark Nordenson as TNEC Director (Based on Chubb Settlement)

144.    The Trustee incorporates by reference each and every allegation set forth above as if fully recited herein.

145.    In his role as director of the Debtor, Nordenson likewise breached his fiduciary duty of care.

146.    Given TNEC's insolvency, Nordenson, as one of TNEC's Directors owed a fiduciary duty of care to TNEC and its creditors, including the duty to preserve and maximize the value of all available insurance proceeds to cover asbestos claims against TNEC and the associated defense costs.

147.    No director who was exercising the requisite level of care in light of the reasonably available information would have believed in good faith that entering the Chubb Settlement was in the best interest of the Debtor or its creditors.

13142024v1

148.   As a result of the above-described breaches of Nordenson's fiduciary duty of care as one of the Debtor's Directors, TNEC and its creditors have been damaged in an amount to be determined at trial, but believed to be in excess of the estimated $63,000,000 of indemnity and defense costs that TNEC abandoned in connection with the Chubb Settlement.

149.   Nordenson, as one of the Debtor's directors, is liable to the Trustee for all damages arising from his breach of his duty of care.

### COUNT VI – Breach of Fiduciary Duty of Care (General Statutes § 33-756(a)-(b)) – Eileen Maguire and John Bly (Based on Chubb Settlement)

150.   The Trustee incorporates by reference each and every allegation set forth above as if fully recited herein.

151.   Given TNEC's insolvency, Maguire and Bly, as TNEC's Directors, each owed a fiduciary duty of care to TNEC and its creditors, including the duty to preserve and maximize the value of all available insurance proceeds to cover asbestos claims against TNEC and the associated defense costs.

152.   In their roles as directors of the Debtor, Maguire and Bly also breached their fiduciary duties of care.  At the time Nordenson was negotiating the Chubb Settlement, Maguire and Bly knew that the Chubb policies were among the Debtor's most significant and valuable remaining assets.

153.   In regard to these insurance assets, they owed a duty to make decisions with the care, including reasonable inquiry, skill and diligence, that a person of ordinary prudence would use under the circumstances.  To the extent they completely delegated their duties as directors in

13142024v1

connection with the negotiation and consummation of the Chubb Settlement to Nordenson, they breached their duty of care through their inaction.

154.    To the extent they actively participated in deliberations and actions leading to the Chubb Settlement, they breached their duties of care as directors for the same reasons alleged above with respect to Nordenson in paragraphs 135 through 149.

155.    To the extent that either or both Maguire or Bly failed to inform themselves concerning the Chubb policies, together with all facts and legal considerations necessary to make an informed decision concerning disposition of those policies, they likewise failed to exercise their duty of care.

156.    Finally, as directors, Maguire and Bly had an independent duty to properly oversee the Debtor's officers.  As alleged above, Nordenson, as CEO, squandered one of the Debtor's most valuable assets by negotiating and entering into the Chubb Settlement.

157.    Had the other Directors properly overseen and evaluated his conduct as CEO in the period leading up to the Chubb Settlement, the imminent harm to the Debtor and its creditors would have become apparent.  Under those circumstances, any director who was attempting to carry out his or her oversight duties in good faith and with the requisite level of care would have prevented Nordenson from causing the Debtor to enter into the Chubb Settlement.

158.    Instead, Maguire and Bly either ignored or acquiesced in Nordenson's reckless and ill-informed decision on the Debtor's behalf.  Either way, due to their inattention and failure to oversee the Debtor's officers, Nordenson was allowed to enter the Chubb Settlement on the Debtor's behalf, which led directly to substantial harm to the Debtor and its creditors.

13142024v1

159.     As a result of the above-described breaches of Maguire and Bly's fiduciary duty of care as the Debtor's Directors, TNEC and its creditors have been damaged in an amount to be determined at trial, but believed to be in excess of the estimated $63,000,000 of indemnity and defense costs that TNEC abandoned in connection with the Chubb Settlement.

160.     Maguire and Bly, as the Debtor's directors, are liable to the Trustee for all damages arising from their breaches of their duty of care.

## COUNT VII – Directors and Officers' Waste of TNEC's Assets
## (Based on Chubb Settlement)

161.     The Trustee incorporates by reference each and every allegation set forth above as if fully recited herein.

162.     As the Directors and Officers of an insolvent company with over 1,600 known asbestos claimants and other creditors, they had a duty to maximize the value of the Debtor's assets.   Instead, they gave away one of the Debtor's most significant assets for inadequate consideration.

163.     As alleged above, the entire business purpose of the Debtor as of 2020 was the administration, resolution and payment of asbestos claims through the use of available insurance funds.   The Chubb policies, with their $52,000,000 in indemnity coverage and the additional obligations to fund accompanying defense costs of those claims, which historically had amounted to at least fifty percent of indemnity amounts, were among the Debtor's only, and certainly most valuable, assets as of 2020.   Nonetheless, Nordenson dealt away tens of millions of dollars in coverage and defense costs under the terms of the Chubb policies by entering into the Chubb Settlement on the Debtor's behalf.   Doing so constituted actionable waste of the Debtor's assets.

164.    In light of the known or readily ascertainable current and future asbestos liability and the need for all available insurance policies to cover and defend such claims, the Chubb Settlement was so one-sided that the Directors and Officers, if they were exercising the level of due care and judgment required of them as directors or officers of the Debtor, could not have reasonably concluded that the Debtor had received adequate consideration or benefit as a result of the Chubb Settlement.

165.    As a result of the above-described waste of the Debtor's assets by the Directors and Officers, TNEC and its creditors have been damaged in an amount to be determined at trial, but believed to be in excess of the estimated $63,000,000 of indemnity and defense costs that TNEC abandoned in connection with the Chubb Settlement.

166.    All of the Directors and Officers are therefore liable to the Trustee for all damages arising from their waste of corporate assets to the financial loss and detriment of the Debtor and its creditors.

13142024v1

## REQUEST FOR RELIEF

WHEREFORE, the Trustee respectfully requests that this Court enter judgment as follows:

1.      On Count I against Mark Nordenson and John Bly as directors of TNEC, jointly and severally, in an amount equal to the damages suffered by TNEC and its creditors as a result of the Defendants' breaches of their fiduciary duty of loyalty, plus interest, costs and attorneys' fees.

2.      On Count II against Mark Nordenson and John Bly as directors of TNEC, jointly and severally, in an amount equal to the damages suffered by TNEC and its creditors as a result of the Defendants' breaches of their fiduciary duty of care, plus interest, costs and attorneys' fees.

3.      On Count III against all Defendants as directors of TNEC, jointly and severally, in an amount equal to the total damages suffered by TNEC and its creditors as a result of the Defendants' breaches of their fiduciary duty of loyalty, plus interest, costs and attorneys' fees.

4.      On Count IV against Mark Nordenson, as an officer of TNEC, in an amount equal to the total damages suffered by the Debtor and its creditors as a result of his breaches of his fiduciary duty of care, plus interest, costs and attorneys' fees.

5.      On Count V against Mark Nordenson as a director of TNEC, in an amount equal to the total damages suffered by the Debtor and its creditors as a result of his breaches of his fiduciary duty of care, plus interest, costs and attorneys' fees.

6.      On Count VI against Eileen Maguire and John Bly as directors of TNEC, in an amount equal to the total damages suffered by the Debtor and its creditors as a result of their breaches of their fiduciary duty of care, plus interest, costs and attorneys' fees.

13142024v1

7.      On Count VII against all Defendants as directors of TNEC, jointly and severally, in an amount equal to the total damages suffered by TNEC and its creditors as a result of the Defendants' breaches of their fiduciary duties and waste of corporate assets, plus interest, costs and attorneys' fees.

8.      Against all Defendants for such other and further relief as the Court may deem equitable and necessary.

## JURY DEMAND

The Trustee demands a trial by jury on all issues so triable.

GEORGE I. ROUMELIOTIS, CHAPTER 7
TRUSTEE

By his counsel,

Daniel C. Cohn (pro hac vice application to be
submitted)
Taruna Garg (ct28652)
Michael P. Connolly (pro hac vice application to
be submitted)
Julie Lavoie (ct31241)

Murtha Cullina LLP
107 Elm Street
Stamford, Connecticut 06902
Telephone:  203.653.5400
dcohn@murthalaw.com
mconnolly@murthalaw.com
tgarg@murthalaw.com
jlavoie@murthalaw.com

13142024v1