**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| GEORGE I. ROUMELIOTIS, | : | CIVIL CASE NO. |
| CHAPTER 7 TRUSTEE FOR | : | 3:23-CV-01366 (JCH) |
| THE NASH ENGINGEERING CO., | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MARK H. NORDENSON, | : | JULY 15, 2024 |
| EILEEN MAGUIRE, and | : | |
| JOHN A. BLY, | : | |
|     Defendants. | : | |

**RULING ON MOTION TO DISMISS (DOC. NO. 23)***

## I.    INTRODUCTION

Plaintiff George I. Roumeliotis ("Roumeliotis" or "Trustee"), Chapter 7 Trustee of

the bankruptcy estate of the Nash Engineering Company ("Nash Engineering"), brings

this action against Mark Nordenson ("Nordenson"), Eileen Maguire ("Maguire") and

John Bly ("Bly") for breaches of fiduciary duties and waste of corporate assets.  See

Complaint ("Compl.") (Doc. No. 1).

Before the court is the defendants' Motion to Dismiss.  See Defendants' Motion

to Dismiss ("Mot.") (Doc. No. 23); Defendants' Memorandum in Support of Motion to

Dismiss ("Mem.") (Doc. No. 23-1); see also Defendants' Reply to Opposition ("Reply")

(Doc. No. 25).  The Trustee opposes this Motion.  See Trustee's Opposition to Motion to

Dismiss ("Opp.") (Doc. No. 24).

For the reasons set forth below, the court denies the Motion to Dismiss.

---

\* The court is also issuing a Ruling on a Motion to Dismiss in a related case, No. 24-CV-00640
(JCH).  To the extent relevant, that opinion is incorporated into the instant Ruling.

1

## II.    BACKGROUND

### A.    Factual Background

This action was commenced by Roumeliotis, the Trustee of the bankruptcy estate of Nash Engineering.  See Compl.  The court provides a summary of allegations relevant to this Ruling with reference to the Trustee's Complaint as well as other background information.  As the court must, it construes all well-pled factual allegations as true for the purpose of deciding the Motion to Dismiss.

The Nash Engineering Company was founded in 1905 by Lewis Nash.  See Compl. ¶ 11.  "[I]ts business primarily consisted of manufacturing liquid ring vacuum pumps used in various industries for vacuum steam heating systems, vacuum sewage collection systems, and to manufacture pulp and papers".  Id.  From 1905 until 2002, Lewis Nash and other members of the Nash family were involved in the ownership, management, or both of the business.  Id. ¶ 12.  In July 2004, Nash Engineering formed Nash Engineering Holdings LLC ("Nash Holdings") and the latter became the former's sole owner.  Id. ¶¶ 20-21.  On October 19, 2021, Nash Engineering filed a voluntary petition under Chapter 7 of the Bankruptcy Code.  Id. ¶ 2.  The following day, on October 20, 2021, Roumeliotis was appointed Chapter 7 Trustee of the bankruptcy estate of Nash Engineering.  Id. ¶ 3.

From 2004 until the date of the bankruptcy petition, Nordenson and Bly contemporaneously served as directors of Nash Engineering and on the board of managers of Nash Holdings.  Id. ¶ 23.  During this time, Nordenson also held the position of Chief Executive Officer ("CEO") for both companies.  See id. ¶ 25.  From 2013, until the date of the bankruptcy petition, Maguire served as a director of Nash Engineering while serving on the board of managers for Nash Holdings.  See id. ¶ 24.

2

Through the defendants, in their capacities as directors, Nash Holdings "elected all of [Nash Engineering]'s directors, approved all of [Nash Engineering]'s business decisions and, ultimately, controlled all aspects of [Nash Engineering]'s affairs." See id. ¶ 26. "This control included, but was not limited to: disposition of [ ] assets, [ ] distribution of [ ] cash to Nash Holdings, payment of [ ] employee salaries, [ ] payment of [ ] ongoing expenses, maintaining [ ] relations with its product-liability insurers and defense counsel, directing negotiations with insurers to settle [ ] insurance policies to benefit Nash Holdings' interests, orchestrating [the] dissolution in April 2020, and initiating [the] voluntary bankruptcy filing in October 2021." See id.

The following events are at issue in the instant case:

1.    Asbestos Lawsuits

From at least 1991 until October 19, 2021, Nash Engineering was a named defendant in thousands of lawsuits brought by claimants alleging injuries or death from exposure to asbestos in its products. Id. ¶ 13. As new individuals were diagnosed with asbestos disease purportedly caused by exposure to Nash Engineering's products, new asbestos-related lawsuits for personal injury or wrongful death were filed against Nash Engineering. Id. ¶ 15. Nash Engineering filed a Statement of Financial Affairs on November 2, 2021, in which it reported that it was a party to over 1,600, then-pending asbestos lawsuits. Id. ¶ 14.

2.    Formation of Nash Elmo & Merger with Gardner Denver

From approximately 2002 until 2009, as new individuals were diagnosed with asbestos disease, "Nash Engineering entered into a series of transactions through which it divested substantially all of its assets . . . and distributed, through Nash Holdings, the proceeds of the [sale of its assets] to" Nash Holdings members. Id. ¶ 15.

Specifically, in March 2002, Nash Engineering entered into a series of transactions with Audax Private Equity Fund, L.P. ("Audax") to combine Nash's business with that of elmo vacuum technology GmbH, a subsidiary of Siemens AG.  Id. ¶ 16.  Nash Engineering and Audax owned approximately 35.75 and 64.25 percent, respectively, of the combined business, which operated under the name, "Nash Elmo." Id. ¶¶ 16-17.

On or about July 28, 2004, pursuant to a Merger Agreement between Nash Elmo and Gardner Denver, Inc. ("Gardner Denver"), Nash Elmo was merged into Gardner Denver, and Gardner Denver acquired the entirety of Nash Engineering's ownership interest in Nash Elmo.  Id. ¶¶ 18, 27.  Nash Engineering's gross and net proceeds from the sale of its interest were in excess of $59.7 million and approximately $44.6 million, respectively.  Id. ¶¶ 27-28.  After the merger, Nash Engineering's assets consisted of cash, life insurance policies, and real estate it leased to Gardner Denver.  Id. ¶ 29.

   3.  Transfers of Proceeds from Sales of Assets

At the time of the merger, Nash Engineering's shareholders included over 100 members of the Nash family, including Nordenson and Bly.  Id. ¶ 19.  The shareholders owned various classes of preferred or common shares in their own name or through trusts.  Id.  Additionally, in connection with the merger, Nash Engineering internally reorganized and formed Nash Holdings.  Id. ¶ 20.  "Upon the formation of Nash Holdings, and concurrent with the closing of the Gardner Denver [m]erger," Nordenson, Bly, and the other shareholders became members of Nash Holdings.  Id. ¶ 21.  In other words, each share of Nash Engineering's common and preferred stock was cancelled and the former shareholders "received an equivalent number of membership units of Nash Holdings with identical rights and restrictions as their prior stock interests in [Nash

Engineering]."  Id.  Subsequently, as of approximately July 2004, Nash Holdings

became the sole owner of Nash Engineering.  Id. ¶ 22.

From approximately 2006 to 2009, Nash Engineering sold its remaining assets

and liquidated its life insurance policies.  Id. ¶ 30.  "According to [Nash Engineering's]

records, and as confirmed by . . . Nordenson at the Section 341 Meeting of Creditors

conducted by the Trustee, [Nash Engineering] transferred to Nash Holdings

substantially all of the [m]erger [p]roceeds it received from the Gardner Denver

[m]erger."  Id. ¶ 31.  Nash Engineering also distributed its proceeds from the sale of its

real estate and liquidation of the policies.  Id. ¶ 32.  In total, between 2004 and 2011,

Nash Engineering transferred approximately $59.72 million to Nash Holdings without

receiving consideration in exchange.  Id. ¶¶ 33, 35.  Nash Holdings then transferred

those assets to its members, who were former shareholders of Nash Engineering.  Id. ¶

34.  "At the time of all of the [transfers to Nash Holdings], [Nash Engineering] was

materially underinsured relative to its substantial current and future asbestos liability."

Id. ¶ 38.

From 2011 onward, Nash Engineering held no cash in its own name.  Id. ¶ 36.

Following the transfers, Nash Engineering did not conduct any business but remained in

existence, until it filed its bankruptcy petition, in order to process and pay asbestos-

related claims until its insurance policies were depleted.  Id. ¶ 37.  At the time of each

transfer, Nash Engineering "knew or should have known that the liabilities it faced from

asbestos claims far exceeded its assets, including potential insurance coverage for

such liabilities."  Id. ¶ 42.

4.    1991 and 2018 Settlements with The Hartford Insurance Company

Nash Engineering had purchased insurance policies from The Hartford Insurance Company ("The Hartford") over the course of several decades prior to 1991.  Id. ¶ 39. In 1991, Nash Engineering and The Hartford entered into a settlement agreement regarding coverage under these policies.  Id.  Under the agreement, Nash Engineering released all claims to coverage under all but ten primary policies.  Id. ¶ 40.  In exchange, The Hartford agreed to pay defense costs and a fixed aggregate amount for indemnity costs related to the asbestos lawsuits under the remaining ten policies.  Id.

Nash Engineering and The Hartford entered into another settlement agreement in 2018.  Id. ¶ 46.  Under their agreement, Nash Engineering released all coverage claims under umbrella and excess Hartford policies.  Id.  In exchange, the Hartford once again agreed to pay defense and fixed aggregate indemnity costs arising from asbestos-related lawsuits.  Id.

"In light of the limited insurance coverage available after the [1991 settlement with The Hartford] and unfavorable developments for policyholders under Connecticut law in 2003, the interests of [Nash Engineering] and its creditors required retention of sufficient proceeds" to ensure Nash Engineering had adequate funds to pay its share of indemnity and defense expenses from asbestos-related lawsuits and "to vigorously

enforce its rights against its insurers and, thus, maximize the value of its remaining assets."[1]  Id. ¶ 41.

Instead, Nash Engineering distributed substantially all proceeds for the benefit of Nash Holdings and its members—"members with whom [the directors and officers of Nash Engineering] were associated either through family relations in the case of Nordenson and Bly or [ ] a separate fiduciary capacity in the case of Maguire . . . ."  Id. ¶ 43.  Because of the transfers, Nash Engineering "was insolvent and/or was rendered insolvent" from the date of the transfers until the date of the bankruptcy petition.  Id. ¶¶ 44-45.  "[I]t was not able to pay its debt as they became due in the usual course of business."  Id. ¶ 44.  Further, its then-"current and reasonably foreseeable future [asbestos-related] liabilities" exceeded its total assets.  Id.

5.     2020 Settlement with Chubb & the Associated Dissolution effort

Nash Engineering had four umbrella policies issued by three Chubb affiliates: Century Indemnity Company, successor to CIGNA Specialty Insurance Company; Federal Insurance Company; and Pacific Employers Insurance Company.  Id. ¶¶ 48 & 48 n.1.  Together, these policies equaled $52 million in aggregate limits.  Id. ¶ 49.  None contained asbestos exclusions; and each provided that defense costs "did not reduce each policy's limits on indemnity available to settle claims or pay judgments".  Id.  Historically, defense costs came out to be more than fifty percent of the average

---

[1] Through briefing, the parties have made clear that "unfavorable developments" refer to Connecticut's adoption of the pro rata method of allocating costs in long latency loss claims implicating multiple insurance policies.  See Mem. at 12; Opp. at 8 n.6; see generally Sec. Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co., 264 Conn. 688 (2003).  Under this approach, "defense and indemnity costs are allocated among insurers on the basis of their time on the risk, but are allocated (prorated) to the insured for periods during which the insured lost or destroyed its policies or was otherwise uninsured or underinsured."  R.T. Vanderbilt Co., Inc. v. Hartford Accident & Indem. Co., 171 Conn. App. 61, 123 (2017), aff'd, 333 Conn. 343 (2019).

indemnity costs.  Id. ¶ 50.  Accordingly, Nash Engineering knew or should have known that the full amount payable to Nash Engineering from Chubb was equal to a policy limit of $52 million plus defense costs of at least $26 million.  Id. ¶ 51.  The total potential payment from Chubb was thus at least approximately $78 million.

By 2020, Chubb disputed "the timing and extent of its payments relative to other potentially available policies and relative to [Nash Engineering]'s own funding obligations."  Id. ¶ 52.  In April 2020, the parties settled.  Id. ¶ 53.  Nash Engineering agreed that "Chubb could 'buy back' [Nash Engineering]'s interests in all known and unknown Chubb policies".  Id.  After this "buy back", the policies would no longer be in effect.  Id.  In exchange, Nash Engineering would effectuate its own corporate dissolution under section 33-887 of the Connecticut General Statutes.  Id. ¶ 54.

Additionally, in the settlement, Nash Engineering and Chubb referenced additional umbrella policies with aggregate limits of $12 million held by Nash Engineering as potential sources of coverage.  Id. ¶¶ 79-80.  These policies were issued by Northbrook Insurance Company ("Northbrook"), Columbia Casualty Company ("CNA"), Stonewall Insurance Company ("Stonewall"), and Allstate.  Id. ¶ 79.  However, none of the insurers of the additional umbrella policies committed to negotiate payment nor provide Nash Engineering with coverage.  Id. ¶ 80.

The settlement effectively called for a maximum payment of $14.35 million from Chubb for defense and indemnity costs for asbestos lawsuits until Nash Engineering dissolved.  Id. ¶ 55.  This sum was less than twenty percent of the $78 million potential payment from the Chubb policies had there been no settlement.  Id. ¶ 61.

Nash Engineering knew or should have known that $14.35 million would not be sufficient to satisfy "reasonably foreseeable indemnity and defense costs" associated with asbestos lawsuits.  Id. ¶ 60.  Before the settlement, Nash Engineering did not perform or obtain an analysis of potential costs associated with asbestos lawsuits.  Id. ¶ 56.  In an email dated December 17, 2020, and in connection with the Chubb settlement, counsel for Gardner Denver asked if Nash Engineering had an analysis of future exposure.  Id.  Counsel for Nash Engineering responded that it did not.  Id.  However, Nash Engineering had available information that confirmed that, from May 2017, until October 2019, payments from The Hartford policies for defense and indemnity costs associated with asbestos lawsuits were, on average, in excess of $6.7 million annually.  Id. ¶ 57.  Additionally, Nash Engineering knew that its national coordinating counsel had created a budget for aggregate indemnity of $6 million for the year 2020.  Id. ¶ 58.  Furthermore, Nash Engineering knew that the number of asbestos lawsuits as well as the settlement amounts had increased over time.  Id. ¶ 59.

Despite the lack of participation from insurers, who were identified as sources of potential coverage by Nash Engineering and Chubb, and the "obvious insufficiency" of the $14.35 million payment from Chubb, Nash Engineering "proceeded with the settlement and the dissolution process in order to start the three-year period after which future creditors' claims would be barred without the risks to Nash Holdings and the Directors of Nash Engineering of a [ ] bankruptcy filing."[2]  Id. ¶ 81.

---

[2] In relevant part, section 33-887 of the Connecticut General Statutes provides that, if a dissolved corporation publishes a newspaper notice in accordance with statute, certain claims against the corporation are barred unless a proceeding to enforce the claim or claims is brought within three years of the publication.  See Conn. Gen. Stat. § 33-887(c).  These claims include those brought by a claimant "who was not given written notice under section 33-886", "whose claim was timely sent to the dissolved corporation but not acted on", or "whose claim is contingent or based on an event occurring after the effective date of dissolution."  See id.

By November 2020, Chubb "had paid or authorized defense and indemnity payments of approximately $6[ ] million, over forty percent of the total settlement amount.  Id. ¶ 62.  In an email dated November 12, 2020, Nordenson wrote: ""The settlement agreement was $13M plus $1.35[M] so remaining is $8.15[M] if all authority extended is paid.  Clearly likely not enough to get to April 2023 unless the burn [ ] is reduced greatly."  Id. ¶ 63.  In August 2021, approximately $3 million of the $14.35 million settlement amount remained.  Id. ¶ 64.  In an email dated August 2, 2021, Maguire wrote: "At this rate, assuming we are unable to get additional coverage from Resolute, Allstate and/or Chubb, [Nash Engineering] will not be able to complete the three year dissolution period."[3]  Id. ¶ 64.  "By September 2021, Chubb reported to [Nash Engineering]: 'These are the financials as of 9/30/21: $11,257,379 paid ($6,412,220 in indemnity and $4,845,159 in expense)[.]  We anticipate having less than $1M in remaining limits by year end 2021.'"  Id. ¶ 66.  Nash Engineering was thus projected to deplete the $14.35 settlement amount halfway through the three-year dissolution period.  Id. ¶ 67.

"The Directors' decision to agree to the Chubb Settlement suffered from at least three fundamental failures of reasonable inquiry or reliance: (1) it was not reasonably based on the known recent defense and indemnity expenses of over $6.7 million per year; (2) it was made without [Nash Engineering] seeking or performing its own analysis or modeling of potential future claims and associated expenses; and (3) it was limited to a three-year period even though the Directors knew that there would likely be thousands

---

[3] "[A]t no point before entering the Chubb Settlement did [Nash Engineering] or the Directors and Officers receive any confirmation, or even suggestion, from Resolute, Allstate or Chubb that those insurers would provide additional coverage to [Nash Engineering] for any period."  Compl. ¶ 65.

more claims made against [Nash Engineering] after the three year dissolution period and that the $52 million total Chubb policy limits, plus the payment of defense costs on top of those limits, could be available to provide coverage for a far greater number of asbestos claimants' claims than would be covered by the Chubb Settlement." Id. ¶ 68.

The decision to try to dissolve the company over three years or to file for bankruptcy was based on the best interests of Nash Holdings and the Nash family rather than those of Nash Engineering or its creditors. Id. ¶ 69. In an email dated March 20, 2020, to Chubb during the negotiations, Nordenson wrote:

> As you know, our primary objective of the settlement with Chubb and subsequently with other identified insurers is for The Nash Engineering Company ("TNEC") and its parent Nash Engineering Holdings LLC ("NEH") to completely wind up both entities' affairs through an orderly dissolution of TNEC and eventual liquidation of NEH in compliance with applicable laws and contractual agreements. This process has been going on for the last 16 years and will conclude after almost 20 years, given the 3 year dissolution process of TNEC under Connecticut law.

Id. ¶ 70. A week later, in an email dated March 27, 2020, Nordenson wrote:

> Again, it's important to remember that Nash's objective since the sale of its entire ownership in an operating business in 2004 has been to liquidate all of its assets and distribute the proceeds to its family shareholders. We are now in the 16th year of this process. In the meantime, the company has tried to utilize its product liability insurance coverage it purchased and paid for in full over many years to settle claims made against it by plaintiffs alleging exposure to asbestos used in Nash products.

Id. ¶ 71. Nash Engineering should have maximized the available limits under its insurance policies given that its directors and officers owed a fiduciary duty to Nash Engineering and its creditors and that Nash Engineering: (1) held no cash or assets with the exception of the insurance policies; (2) was insolvent at the time it negotiated settlement with Chubb; and (3) faced foreseeable indemnity and defense costs that likely exceeded the value of its insurance policies. Id. ¶ 72. The settlements "left the

existing and future creditors without any recourse to insurance that [Nash Engineering] previously had purchased and relied upon to address asbestos claimants' claims."  Id. ¶ 73.

### 6.      Refusal to Pursue Bankruptcy

By the time Nash Engineering decided to pursue dissolution, its "[d]irectors had specifically considered and rejected a more orderly marshalling of assets and liquidation through a bankruptcy filing."  Id. ¶ 75.  A memorandum, dated January 16, 2020, advised the directors, in relevant part, that Chapter 7 bankruptcy presented the following risks or challenges:

1. Uncertainty as to outcome.
2. Potential litigation by various parties against NEH [(Nash Holdings)], Hartford, [Nash Engineering] directors and/or officers, others.
3. Plaintiffs' lawyers and bankruptcy Trustee looking for any/all potential assets.
4. If plaintiffs' lawyers and/or bankruptcy Trustee pursues Chubb coverage (or any other [Nash Engineering] coverage), [Nash Engineering]'s insurers may sue Hartford, in which case, Hartford would likely pursue [Nash Engineering] for indemnification.
5. If [Nash Engineering] pursues chapter 7, it should do so without cash available to fund the bankruptcy Trustee's search for assets and having received releases from the insurers.

Id. ¶ 76.  To protect the interests of Nash Holdings and the personal interests of the directors, the directors pursued dissolution and thereby avoided at the time potential litigation resulting from filing for bankruptcy.  Id. ¶ 77.  Further, the directors only considered the possibility of filing for bankruptcy if Nash Engineering did not have "cash available to fund the bankruptcy Trustee's search for assets."  Id. ¶¶ 76, 78.

### 7.      Bankruptcy Petition

CNA and Stonewall brought an action against Nash Engineering in August 2021, seeking a declaratory judgment affirming their denials of coverage.  Id. ¶¶ 82 & 82 n.2.

Nash Engineering "lacked the resources to defend against this lawsuit and prosecute the necessary counterclaim to obtain coverage" following the transactions associated with the transfers to Nash Holdings.  Id. ¶ 83.  Consequently, on October 19, 2021, Nash Engineering filed for bankruptcy.  Id. ¶ 84.

        B.     Procedural Background

The Trustee filed the Complaint against the defendants on October 18, 2023.  See Compl. (Doc. No. 1).  The defendants moved to dismiss on January 12, 2024.  See Mot. (Doc. No. 23).  The Trustee filed his Opposition Memorandum to the Motion to Dismiss on February 9, 2024.  See Opp. (Doc. No. 24).  The defendants filed their Reply on February 23, 2024.  See Reply (Doc. No. 25).

## III.    LEGAL STANDARD

        A.     Rule 12(b)(6)

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp v. Twombly, 550 U.S. 544, 570 (2007)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id.  Reviewing a motion to dismiss under Rule 12(b)(6), the court liberally construes the claims, accepts the factual allegations in the complaint as true, and draws all reasonable inferences in the nonmovant's favor.  See La Liberte v. Reid, 966 F.3d 79, 85 (2d Cir. 2020) (citing Palin v. New York Times Co., 940 F.3d 804, 809 (2d Cir. 2019)).  However, the court does not credit legal conclusions or "[t]hreadbare recitals of the elements of a cause of action."  Iqbal, 556 U.S. at 678.

B.    Rule 9(b)

Rule 9(b) requires that, in alleging fraud, a party must "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  A complaint alleging fraud must ordinarily: "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  Olson v. Major League Baseball, 29 F.4th 59, 71 (2d Cir. 2022) (quoting Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004)).  However, "the adequacy of particularized allegations under Rule 9(b) is . . . case- and context-specific."  United States ex rel. Chorches for Bankruptcy Estate of Fabula v. Am. Med. Resp., Inc., 865 F.3d 71, 81 (2d Cir. 2017) (internal quotations and citations omitted).  "Despite the generally rigid requirement [of Rule 9(b)], allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge."  Id. at 81-82 (internal quotations and citations omitted).  "Pleading on information and belief" is therefore "a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject."  Id. at 82 (internal quotations and citations omitted).  When pleading on information and belief, a complaint must "adduce specific facts supporting a strong inference of fraud."  Id. (internal quotation marks and citations omitted).

Rule 9(b) also provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. Pro. 9(b).  "The [S]econd [C]ircuit has recognized that the requisite intent of the alleged speaker of the fraud need not be alleged with great specificity . . . for the simple reason that a plaintiff realistically

cannot be expected to plead a defendant's actual state of mind." Conn. Gen. Life Ins.

Co. v. True View Surgery Ctr. One, LP, 128 F. Supp. 3d 501, 507-08 (D. Conn. 2015)

(internal quotations and citations omitted).

## IV.    DISCUSSION

The Trustee asserts seven counts against the defendants.  In Counts I and II, he

claims Nordenson and Bly, as Directors, breached their fiduciary duties of loyalty and

care based on the Nash Holdings transfers.  See Compl. ¶¶ 101-24.  Counts III-VII

consist of claims based on the Chubb Settlement.  See id. ¶¶ 135-66.  In Count III, the

Trustee claims Maguire and Bly, as Directors, and Nordenson, as Director and Officer of

Nash Engineering, breached their duties of loyalty.  See id. ¶¶ 125-34.  Together,

Counts IV and V allege that Nordenson, as CEO and Director of Nash Engineering,

breached his fiduciary duties of care under section 33-756 of the Connecticut General

Statutes.  See id. ¶¶ 135-49.  Count VI alleges Maguire and Bly, as Directors of Nash

Engineering, breached their fiduciary duties of care under section 33-756.  See id. ¶¶

150-60.  Count VII alleges the defendants wasted Nash Engineering's assets.  See id.

¶¶ 161-66.  The Trustee further affirmatively alleges two tolling theories: continuing

course of conduct, see id. ¶¶ 85-92; and fraudulent concealment, see id. ¶¶ 93-100.

The defendants move to dismiss on Counts I and II on the ground that they are

time-barred and the Trustee has not adequately pled his tolling theories of fraudulent

concealment or continuing course of conduct.  See Mem. at 14-25.  They move to

dismiss all claims (Counts I-VII), arguing that the Trustee has neither pled the existence

of a fiduciary relationship nor rebutted the business judgment rule.  See id. at 25-32.

A.      Timeliness (Counts I & II)

It is uncontroverted that the Trustee's breach of fiduciary duty claims in Counts I and II are governed by the statute of limitations applicable to tort actions contained in section 52-577 of the Connecticut General Statutes, which may be tolled by the doctrines of fraudulent concealment or continuous course of conduct.[4] See Speer v. Norwich Public Utilities, No. 3:19-CV-2005 (JCH), 2021 WL 1978702, at *4 (D. Conn. May 18, 2021) (citing Tunick v. Tunick, 201 Conn. App. 512, 536-53 (2020)).  The parties dispute whether the Trustee has adequately pled either of the two tolling doctrines.

1.      Fraudulent Concealment

Fraudulent concealment tolls the statute of limitations if the defendant (1) was actually aware of the necessary facts that establish the cause of action; (2) intentionally concealed those facts from the plaintiff; and (3) did so in order to obtain a delay on the plaintiff's part in the filing of a claim.  See Tunick, 201 Conn. App. at 552; Carson v. Allianz Life Ins. Co. of N.A., 184 Conn. App. 318, 326 (2018).  Further, "[a]lthough [section] 52–595 does not explicitly say so, it clearly implies that plaintiff's ignorance of the facts is a necessary element of tolling under that statute."  Martinelli v. Bridgeport Roman Cath. Diocesan Corp., 196 F.3d 409, 427 (2d Cir. 1999).  If the existence of the cause of action has been fraudulently concealed, the statute of limitations begins to run

---

[4] The court notes that the relevant date from which to measure whether the Trustee's claims are timely is the date on which Nash Engineering filed its voluntary bankruptcy petition, October 19, 2021. Section 108 of the Bankruptcy Code extends statutes of limitations under non-bankruptcy law to permit the Trustee to bring a cause of action that was extant as of the date of the bankruptcy petition within the time outlined in section 546(a).  See 11 U.S.C. § 108(a); see also In re Bernard L. Madoff Inv. Sec. LLC, 445 B.R. 206, 231 (Bankr. S.D.N.Y. 2011) (collecting cases).  In relevant part, section 546(a) allows the Trustee to bring an action within two years of the filing of Nash Engineering's petition.  See 11 U.S.C. § 546(a); see also 11 U.S.C. § 301(b) ("The commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter.").

on the date the plaintiff discovered the existence of his cause of action or knew his claims were plausible.  See Conn. Gen. Stat. § 52-595.

Notably, because invoking this tolling doctrine requires proof of fraud, the particularity requirement of Rule 9(b) of the Federal Rules of Civil Procedure applies to the corresponding pleadings.  See McCullough v. World Wrestling Ent., Inc., 172 F. Supp. 3d 528, 555 (D. Conn. Mar. 21, 2016) (citing In re Publ'n Paper Antitrust Litig., No. 30-MD-1631 (SRU), 2005 WL 2175139, at *5 (D. Conn. Sept. 7, 2005)).  As discussed in more detail, supra, see Section III.B., Rule 9(b) requires that the party pleading fraud "state with particularity the circumstances constituting fraud or mistake." See Fed. R. Civ. P. 9(b).  However, the defendant's state of mind need only be pled generally.  See id.; Slainte Invs. Ltd. P'ship v. Jeffrey, 142 F. Supp. 3d 239, 262 (D. Conn. 2015) ("Rule 9(b) permits states of mind to be pled generally for a reason: absent discovery, [the] [p]laintiff is simply in no position to know why his adversary did what he did.  Moreover, it is reasonable to infer, at this stage, that one reason [the defendant] continued to conceal his initial fraud was to keep [the] [p]laintiff away from the courthouse pending the expiration of the limitations period.").

In response to the defendants' Motion to Dismiss, the Trustee argues, inter alia, that the transfers at issue were self-concealing.  See Opp. at 21-22.  In their Reply, the defendants counterargue that, because Connecticut has never adopted a theory of fraudulent concealment based on self-concealing actions, the Trustee will never be able to establish such a theory.  See Reply at 3-4.

In Falls Church Group, Ltd. v. Tyler, Cooper & Alcorn, LLP, 281 Conn. 84 (2007), the Connecticut Supreme Court held that, when a defendant has a fiduciary duty to

disclose material information, the plaintiff need not establish an affirmative act of concealment on the part of the defendant to toll the statute of limitations under the fraudulent concealment doctrine.  See 281 Conn. 84, 107 (2007); OBG Tech. Servs., 503 F. Supp. 2d at 505.  In those instances, nondisclosure is sufficient.  Falls Church Grp., 281 Conn. at 107.  The Court further "refus[ed] to provide a rigid, finite definition of a fiduciary relationship", see id. at 110, because "[f]iduciaries appear in a variety of forms, including agents, partners, lawyers, directors, Trustees, executors, receivers, bailees and guardians.  [E]quity has carefully refrained from defining a fiduciary relationship in precise detail and in such a manner as to exclude new situations", see id. at 108-09 (quoting Konover Development Corp. v. Zeller, 228 Conn. 206, 222–23 (1994)).  Thus, where, as here, the plaintiff adequately pleads the existence of a fiduciary relationship, see, infra, Section IV.B., Connecticut would not require dismissal because a plaintiff alleged only self-concealing acts rather than affirmative acts of concealment.

Even assuming, arguendo, the Trustee had not pled the existence of a fiduciary relationship, dismissal would not have been warranted.  While the Connecticut Supreme Court has not recently addressed the issue of whether a self-concealing act can satisfy a tolling theory based on fraudulent concealment absent a fiduciary relationship, it does not follow that the Trustee's theory would fail.  If state law is "uncertain or ambiguous", a federal court must "carefully [ ] predict how the highest court of the forum state would resolve the uncertainty or ambiguity."  Lelchook v. Société Générale de Banque au Liban SAL, 67 F.4th 69, 76 (2d Cir. 2023) (quoting Yukos Cap. S.AR.L. v. Feldman, 977

F.3d 216, 241 (2d Cir. 2020)); see also Kasiotis v. N.Y. Black Car Operators' Injury

Comp. Fund, 90 F.4th 95, 99 (2d Cir. 2024).

> This court notes that:
>
> [I]n Fichera v. Mine Hill Corp., 207 Conn. 204, 541 A.2d 472 (1988), the
> Connecticut Supreme Court referred to the concept of a self-concealing
> violation and cited to the United States Supreme Court's decision in Bailey
> v. Glover, 88 U.S. (21 Wall.) 342, 22 L.Ed. 636 (1874)[,] in the course of
> discussing how affirmative acts of concealment may not always be required
> to prove fraudulent concealment.  Bailey is the foundational decision for
> federal common law regarding fraudulent concealment and is generally
> considered the originator of the concept of a self-concealing violation.

OBG Tech. Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp., 503 F.

Supp. 2d 490, 506 (D. Conn. 2007) (citing Fichera, 207 Conn. at 215 & 215 n.5).  Thus,

at the motion to dismiss stage, this court has previously assumed, without deciding, that

Connecticut law would not require the plaintiff to show an affirmative act on the part of

the defendant if the violative act was self-concealing.  See id.  The court sees no reason

to depart from this approach.  As such, even if the Trustee had not claimed the

existence of fiduciary duties, he would not have needed to plead an affirmative act

provided he adequately pled self-concealing acts.

In order to plead the defendant's acts were self-concealing, the plaintiff must

plausibly allege that: (1) "the violation must be of such a nature as to be self-concealing

in that it 'is, by its nature, inherently unknowable'"; and (2) although the fraud is self-

concealing, he still "exercised reasonable diligence to discover the cause of action

under the circumstances."  AT Engine Controls Ltd. v. Goodrich Pump & Engine Control

Sys., Inc., No. 3:10-CV-01539 (JAM), 2014 WL 7270160, at *13 (D. Conn. Dec. 18,

2014) (quoting OBG Technical Servs., 503 F. Supp. 2d at 506-07).  To establish

reasonable diligence, the plaintiff must ordinarily show that: "(a) the circumstances were

such that a reasonable person would not have thought to investigate, or (b) the plaintiff's attempted investigation was thwarted." Id.

Here, the Trustee alleges that Nash Engineering and Nash Holdings are private companies and therefore their transfers were not subject to public disclosure. See Compl. ¶ 96. As a matter of common sense, this would make the transfers self-concealing because they were "inherently unknowable" to everyone except corporate insiders, unless the companies voluntarily disclosed such information. The Trustee further alleges that no details were shared or made available to creditors. See id.

Reasonable diligence can be inferred from several allegations. First, the Trustee asserts that the corporate records and information pertaining to the transfers remained undisclosed until he could access them when he was appointed an independent fiduciary. See id. ¶ 99. The Trustee plausibly alleges that the directors intentionally delayed filing for bankruptcy. See id. ¶ 95. By purportedly keeping Nash Engineering in existence and continuing to process claims under available insurance policies or settlement funds, asbestos claimants could not discover the transfers. See id.; see also e.g., id. ¶ 71 (March 27, 2020 email), id. ¶ 76 (January 16, 2020 memorandum). In other words, because there were funds available to cover litigation costs for some time, Nash Engineering's creditors, i.e., the asbestos plaintiffs, would have had essentially no reason to investigate the company's asset management. Only after the bankruptcy petition and the subsequent appointment of the Trustee would potential asbestos claimants discover the transfers to Nash Holdings. See id. ¶ 99.

Further, a memorandum dated January 16, 2020, advised the directors, in relevant part, that Chapter 7 bankruptcy presented the risk that the bankruptcy Trustee

would look for assets or sue Nash Engineering's insurers and in turn the insurers would likely seek indemnification from Nash Engineering.  See id. ¶ 76.  The memorandum further advised Nash Engineering that, if it pursues bankruptcy, it should do so without cash available and after receiving releases from insurers to prevent the Trustee's asset search.  See id.  Additionally, in two emails sent in late March 2020, during the Chubb settlement negotiations, Nordenson expressed that, since the sale of its ownership interest in Nash Elmo in 2004, Nash Engineering's objective has been to dissolve and liquidate its assets and to distribute proceeds to the Nash family shareholders.  See id. ¶¶ 70-71.

Together, the foregoing allegations support a plausible inference that the circumstances were such that a reasonable asbestos claimant would not have known to investigate.  The allegations, particularly those pertaining to the communications from Nash Engineering, e.g., the memorandum dated January 16, 2020, see Compl. ¶ 76, also support a plausible inference that the investigations from asbestos claimants were thwarted by Nash Engineering.  As such, the Trustee sufficiently alleged the "inherently unknowable" nature of the transfers and the exercise of due diligence.

Having plausibly alleged self-concealing acts, the court looks to whether the Trustee satisfied the remaining elements of fraudulent concealment: (1) that the defendants were aware of the facts necessary to the Trustee's claims; and (2) that the defendants had the specific intent to delay the filing of such claims.  See Tunick, 201 Conn. App. at 552.  The court need not engage in an extensive analysis as the same allegations supporting the existence of self-concealing acts, see, e.g., Compl. ¶¶ 71, 75-76, also support a plausible inference that the defendants had the requisite awareness

and intent.  See Falls Church Grp., Ltd., 281 Conn. at 111-12 ("the cumulative effect of [ ] facts"—establishing that the defendant distributed disclosure statements containing misleading information, was informed that this violated state law, and never corrected or ceased relying on such statements—could lead a reasonable [person] to believe that the purposeful delay of a lawsuit could be established")

The defendants contend that the allegations pertaining to the "self-concealing" nature of the transfers and the exercise of due diligence in discovering the transfers are insufficient in light of the "plethora of publicly available information" concerning the Gardner Denver merger.  See Mem. at 18-19.  Although the court is normally limited to the four corners of the Complaint when ruling on the sufficiency of the allegations, see Fed. R. Civ. P. 12(d), it may take judicial notice of public information, not for the truth of the matter asserted therein but to establish notice.  Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008).  The defendants offer several exhibits that they purport provide notice of the transfers.  See Defs.' Ex. B, Certificate of Dissolution (Apr. 20, 2020), Certificate of Dissolution (Dec. 31, 2008), Certificate of Merger (Aug. 30, 2004), & Certificate of Amendment (Aug. 30, 2004) (Doc. No. 23-3); Defs.' Ex. C, Agreement and Plan Merger (July 28, 2004) (Doc. No. 23-4).

At most, the excerpt of the Agreement and Plan Merger provided to the court discloses the sale of Nash Engineering's ownership interest in Nash Elmo, see, e.g., Defs.' Ex. C, Agreement and Plan Merger (July 28, 2004)[5]; and the 2004 Certificate of Amendment provides that Nash Engineering had the option to dissolve as early as

---

[5] The court notes that the excerpt of the Agreement and Plan Merger in defendants' Exhibit C is only comprised of a five-page table of contents and the introduction.  See Defs.' Ex. C, Agreement and Plan Merger (July 28, 2004).

2009, provided its insurance policies were exhausted.[6]  See Defs.' Ex. B, Certificate of Amendment (Aug. 30, 2004).  However, a word search of relevant key terms reveals that none of these documents mention Nash Holdings, let alone anything related to the transfers at issue here.  To the extent the defendants implicitly argue that a reasonable person would understand that Nash Engineering would soon hold no assets of its own after reviewing these documents, the court disagrees.  Nash Engineering remained in existence for a decade or more following: (1) the first date upon which it could have feasibly dissolved (January 30, 2009), and (2) the 2004-2011 transfers.  Thus, whatever notice the Certificate of Amendment provided regarding a potential dissolution of Nash Engineering and any accompanying foreseeable depletion of its assets, it did not apprise non-insiders of when Nash Engineering could or would dissolve.  See Defs.' Ex. B, Certificate of Amendment (Aug. 30, 2004).  Nor does the possibility of a future dissolution signify Nash Engineering would be insolvent in the years the transfers took place, 2004 to 2011.  As such, the court concludes there is no basis for the defendants' argument that the public documents presented to the court provided notice of Nash Engineering's plan to transfer proceeds from its sale of assets to Nash Holdings.

---

[6] The Certificate of Amendment amended Nash Engineering's Certificate of Incorporation by adding an article that provided, in relevant part:

> [U]ntil the later to occur of: (a) December 31, 2008; or (b) the date on which all Insurance Policies . . . have been exhausted and are no longer in effect and thirty days have expired from the date the Corporation provides notice to Gardner Denver, Inc. of its intention to do any of the acts described in (i)-(iv) below, . . . the Corporation shall not do any of the following: (i) dissolve, (ii) consolidate or merge with or into any other entity where the Corporation is not the surviving entity or where such surviving entity does not continue to be bound by the provisions provided for in this Article [ ]; (iii) transfer or distribute any of the Insurance Policies to any other entity; or (iv) repeal, amend or otherwise modify any provision pertaining to this Article [ ] without the consent of Gardner Denver, Inc., which may be withheld in its sole discretion.

See Defs.' Ex. B, Certificate of Amendment (Aug. 30, 2004).

Therefore, the Trustee has sufficiently alleged fraudulent concealment for the purpose of tolling of the three-year limitations period applicable to the breach of fiduciary duty claims in Counts I and II based on the transfers made in 2004 to 2011. Accordingly, the court denies the defendants' Motion to Dismiss on the ground that Counts I and II are untimely.[7]

      B.     Fiduciary Relationship (Counts I-VII)

In Counts I-VI, the Trustee alleges the defendants breached the fiduciary duties of care and loyalty.[8]  A plaintiff claiming breach of fiduciary duty is generally required to prove: "(1) the existence of a fiduciary relationship, giving rise to a duty[;] (2) breach of that duty[;] (3) causation[;] and (4) damages."  Barash v. Lembo, 348 Conn. 264, 301 (2023) (collecting cases from various jurisdictions); see also In re Thornton, No. 23-50216, 2024 WL 844971, at *6 n.2 (Bankr. D. Conn. Feb. 28, 2024) (slip copy) (noting that, in Barash, the Connecticut Supreme Court suggested that the four elements apply "in all situations, not just for Trustees", "aligning with the 'substantial majority of other jurisdictions'").

In the instant case, the crux of the parties' dispute regarding the sufficiency of the claims of breach of fiduciary duty pertains to the first element.  Whether a fiduciary relationship exists is a question of law.  Biller Assocs. v. Peterken, 269 Conn. 716, 771 (2004).  Neither the Connecticut Supreme Court nor the Appellate Court has addressed the issue of whether or under what circumstances a creditor has standing to bring

---

[7] Having found that the Trustee has sufficiently alleged fraudulent concealment, the court need not address his theory of tolling under the continuing course of conduct doctrine for the purposes of this Motion.

[8] For the purposes of the defendants' Motion to Dismiss, the court need not discuss the difference between the duty of care and the duty of loyalty as the only issue currently in dispute is the existence of a fiduciary relationship.

claims for breach of fiduciary duty against a corporation's directors and officers.
Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC, 739 F. Supp. 2d 100, 101 (D.
Conn. 2010).  The Connecticut Superior Courts as well as other jurisdictions have
determined that directors and officers generally do not owe direct fiduciary duties to
creditors; thus, absent special circumstances, such as when a corporation is insolvent,
creditors ordinarily do not have standing to bring claims for breach of fiduciary duty
against a corporation's directors or officers.  Master-Halco, Inc., 739 F. Supp. 2d at 101-
03.  This court (Kravitz, J.) has previously determined that, "as a predictive matter,"
Connecticut would, at most, permit claims by creditors by either "limit[ing] director's
fiduciary duties to creditors to the period of actual insolvency" or "limit[ing] creditors to
derivative claims for actions taken during the zone of insolvency."  Id. at 103.
Therefore, for the purpose of the instant Ruling, the court concludes that creditors may
assert claims for breach of fiduciary duties during a company's insolvency.

The definition of insolvency is codified in section 52-552c of the Connecticut
Uniform Fraudulent Transfer Act ("CUFTA").  See Conn. Gen. Stat. § 52-552c.  In
relevant part, the statute provides that "[a] debtor is insolvent if the sum of the debtor's
debts is greater than all of the debtor's assets at a fair valuation."[9]  See id.  Moreover,
for the purposes of determining insolvency, CUFTA excludes assets constituting
"property that has been transferred, concealed or removed with intent to hinder, delay or
defraud creditors or that has been transferred in a manner making the transfer voidable
under sections 52-552a to 52-552l, inclusive".  See id. § 52-552c(d).  Notably, the

---

[9] Debts include liabilities on claims.  See Conn. Gen. Stat. § 52-552b(5).  A "claim" is defined in
CUFTA as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated,
fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."
See id. § 52-552b(3).

Bankruptcy Code provides a similar definition.  It defines insolvency "with reference to an entity other than a partnership and a municipality" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of" (1) "property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and" (2) "property that may be exempted from property of the estate under section 522 of this title".  See 11 U.S.C. 101(32).

The defendants seem to press the argument that, because it held assets, i.e., insurance coverage, Nash Engineering was not insolvent until it filed for bankruptcy. See Mem. at 19-26, 28-29.  As such, according to the defendants, no fiduciary relationship existed between themselves and the asbestos claimants during those periods of time.  See id.  The Trustee counterargues that he alleged the company was insolvent at the time of the transfers and of the Chubb settlement and pled sufficient factual predicates to plausibly infer insolvency as defined by state and federal law.  See Opp. at 5-10, 27-29.

The court agrees with the Trustee.  The defendants' argument is based on a gross misstatement of the definition of insolvency, which requires a comparison of all assets and debts.  See Conn. Gen. Stat. § 52-552c(a).  While the existence of funds from insurance coverage or settlements with insurers is certainly relevant to the inquiry of whether Nash Engineering was insolvent at the relevant time periods, it does not conclusively establish that the sum of these assets—or any other assets it might have had—was greater than its debts.  Put simply, unless its debts were less than its assets, the mere fact that Nash Engineering held assets did not mean it was solvent.

Here, the Trustee alleges that Nash Engineering faced liability from asbestos-related lawsuits as early as 1991, see Compl. ¶ 13, and, in light of the company's settlement with the Hartford in 1991 as well as "unfavorable developments for policyholders under Connecticut law in 2003,"[10] Nash Engineering was required to retain enough assets to ensure it could pay its pro rata share of indemnity and defense costs for asbestos-related claims for which it was a named defendant, see id. ¶ 41. Instead, according to the Complaint, Nash Engineering transferred proceeds from its sales of assets to Nash Holdings and held no cash of its own.  See id. ¶ 43.  Further, allegedly, after 2011, Nash Engineering's assets only included insurance coverage under several policies.  See, e.g., id. ¶ 37.  The Complaint further alleges "the current and reasonably foreseeable future [asbestos-related] liabilities" exceeded the funds available from insurance policies or settlements with insurers.  See id. ¶ 44.  As the Trustee emphasizes, see Opp. at 7-10, the Complaint contains allegations from which it can be plausibly inferred that the corporation was insolvent at the time of the transfers.

With respect to the remaining counts based on the Chubb settlement, Counts III through VII, the defendants reiterate their contention that Nash Engineering was not insolvent until it filed for bankruptcy.  See Mem. at 28-29.  However, in the Complaint, the Trustee asserts that the "known historic volume and settlement value of the asbestos claimants' claims [ ] demonstrated that even the full face value of the Chubb Policies would not be sufficient to cover [Nash Engineering]'s liabilities for such claims as they came due."  See Opp. at 28 (citing Compl. ¶¶ 51, 57-60).  Because the Trustee

---

[10] Both sides take these "unfavorable developments for policyholders" under state law to mean Connecticut's pro rata share allocation for insurance obligations for asbestos lawsuits.  See, supra, at 7 n.1.

also alleges that, following the last of the transfers in 2011, Nash Engineering held no cash of its own, see id. ¶ 43, the company's insolvency at the time it entered into a settlement agreement with Chubb can be plausibly inferred.

For the aforementioned reasons and based on the well-pleaded allegations from which insolvency can be plausibly inferred, at this stage, the court concludes that asbestos claimants have standing to assert claims for breaches of fiduciary duties based on the transfers or Chubb settlements.  Accordingly, the court denies the defendants' Motion to Dismiss on the ground that the Trustee has not adequately alleged the existence of a fiduciary relationship.

C.   Business Judgment Rule (Counts I-VII)

The defendants move to dismiss all Counts on the ground that the Trustee has not offered sufficient allegations to rebut the business judgment rule.  See Mem. at 26-28, 29-32.

The business judgment rule is a background common law principle that insulates certain business decisions from judicial review.  See Rosenfield v. Metals Selling Corp., 229 Conn. 771, 785-88 (1994); United States v. Rankin, 422 F. Supp. 3d 564, 582 (D. Conn. 2019).  However, "the business judgment rule extends only as far as the reasons which justify its existence."  United States v. Rankin, 422 F. Supp. 3d 564, 582 (D. Conn. 2019) (quoting Joy v. North, 692 F.2d 880, 886 (2d Cir. 1982)).  "[I]t does not apply in cases, e.g., in which the corporate decision lacks a business purpose, is tainted by a conflict of interest, is so egregious as to amount to a no-win decision, or results from an obvious and prolonged failure to exercise oversight or supervision."  Id. (quoting Joy, 692 F.2d at 886); see also Martinelli v. Bridgeport Roman Cath. Diocesan Corp., 196 F.3d 409, 428 (2d Cir. 1999) ("For the policy reasons explored in Murphy [v.

Wakelee, 247 Conn. 396 (1998)], when a plaintiff seeks the tolling provided by the statute and the defendant owes a fiduciary duty to the plaintiff, the burden of proof on the issue of the propriety of the defendant's conduct is shifted to the defendant; it must prove its own fair dealing.").

It bears emphasis that consideration of the business judgment rule at this stage is not without its difficulties.  As the court expressed in In re Science, Language, and Arts International School:

> . . . the protections of the business judgment rule would be flimsy indeed if conclusory allegations at the pleadings stage, without more, were sufficient to establish the plausibility of a fiduciary breach claim. That is, more than bare conclusory allegations are required.  At the same time, a fiduciary's performance of his or her duties is – necessarily – a fact-intensive matter, and courts should hesitate to dismiss fiduciary breach claims at the pleadings stage because the record may demonstrate, after discovery, a dispositive motion, or trial, that the protection of the business judgment rule is warranted.

In re Sci., Language, & Arts Int'l Sch., — B.R. —, No. 22-40065-ESS, 2024 WL 2041338, at *19 (Bankr. E.D.N.Y. May 7, 2024).  In light of the foregoing, the court will proceed by determining whether "disinterestedness, due care, good faith, and the absence of abuse of discretion or waste of corporate assets", see id., can be plausibly inferred from non-conclusory allegations in the Complaint.  See also id. at *20 ("[I]f plaintiff has made a prima facie showing of a lack of . . . disinterested independence . . . the complaint may not be dismissed based on the business judgment rule alone." (internal quotation marks and citation omitted)).

The defendants move to dismiss all Counts on the ground that the Trustee has not sufficiently alleged any fraud, self-dealing, or conflict of interests that would rebut the business judgment rule.  See Mem. at 26-28, 29-30.  With respect to Counts I and II against Nordenson and Bly, the defendants argue that the allegation that defendants

served dual roles at Nash Engineering and Nash Holdings is "boilerplate and contrary to the undisputed fact that the distribution of Nash[ Engineering]'s assets was governed by the transaction documents with Gardner Denver."  See id. at 27-28.  Specifically, they contend that Gardner Denver insisted upon—and the 2004 Certificate of Amendment made public—that, upon completion of Gardner Denver's acquisition of Nash Elmo, Nash Engineering was to hold no assets beyond the insurance policies available to satisfy asbestos injury claims.  See id. (citing Defs.' Ex. B, Certificate of Amendment (Aug. 30, 2004)).

At the outset, the court notes that, as discussed supra, in Section IV.A.1., the court may take judicial notice of public information, such as the 2004 Certificate of Amendment, in disposing of a Rule 12(b)(6) motion, not for the truth of the matter asserted therein, but for the purpose of establishing notice.  See Staehr, 547 F.3d at 425.  As the court already noted in the context of determining whether creditors had notice of the transfers, the Certificate of Amendment gave Nash Engineering the option to dissolve as early as 2009, provided its insurance policies were exhausted.  See Defs.' Ex. B, Certificate of Amendment (Aug. 30, 2004).  Nowhere does it provide notice that Nash Engineering was prohibited from holding assets or, in particular that transfers of the proceeds Nash Engineering received from the merger of Nash Elmo and Gardner Denver, see, supra, at 4, would be made to Nash Holdings, nor could a reasonable person infer from this document that Nash Engineering would soon hold no cash assets. See, supra, Section IV.A.1.  Therefore, the defendants' argument is wholly without basis.

Further, the court concludes there are sufficient allegations from which it is reasonable to infer that the defendants had a conflict of interest or were engaged in self-dealing.[11]  In the Complaint, the Trustee alleges that Nordenson and Bly, as members of the extended Nash family and previous Nash Engineering shareholders, became members of Nash Holdings.  See Compl. ¶ 102.  Furthermore, they both served as directors of Nash Engineering and on the board of managers for Nash Holdings from 2004 until Nash Engineering's bankruptcy petition filing.  See id. ¶ 23.  Nordenson was also the CEO of both companies during the same time period.  See id. ¶ 25.

Nordenson and Bly allegedly acted solely for the benefit of Nash Holdings and the extended Nash family, including themselves, without regard for the interests of Nash Engineering's creditors by transferring the funds to Nash Holdings and not ensuring that Nash Engineering had adequate funds via insurance coverage.  See, e.g., id. ¶¶ 41, 56-60, 105-07.  These allegations support a plausible inference that Nash Holdings and Nash Engineering had conflicting interests during the timeframes at issue and that Nordenson and Bly prioritized the former's interests.  Further, it can be plausibly inferred that Nordenson and Bly had a personal stake in the outcome because they, along with their extended family members, stood to benefit from the transfers.

Concerning Counts III-IV against all defendants, which consist of claims based on the Chubb settlement, the defendants contend that the Trustee's claims are predicated on the assumption that Chubb would pay the full policy limit of $52 million in

---

[11] Connecticut defines a director's "conflicting interest transaction" as "a transaction effected or proposed to be effected by the corporation, or by an entity controlled by the corporation, (A) to which, at the relevant time, the director is a party, (B) respecting which, at the relevant time, the director had knowledge and a material financial interest known to the director, or (C) respecting which, at the relevant time, the director knew that a related person was a party or had a material financial interest."  See Conn. Gen. Stat. § 33-781(1).

indemnity costs.  See Mem. at 12-13.  The defendants argue that, because Chubb had

contested its corresponding allocation of coverage at various times under Connecticut's

pro rata allocation approach to insurance obligations in asbestos lawsuits, their course

of action regarding the Chubb settlement was reasonable.  See Mem. at 31-32.

However, the reasonableness of defendants' actions is not an appropriate inquiry at the

Motion to Dismiss stage.

        The defendants further assert that they stood to gain nothing in the Chubb

settlement.  See id. at 29-30.  As noted, see, supra, at 30, Nordenson and Bly

contemporaneously served as directors of Nash Engineering and managers of Nash

Holdings at all relevant times.  Maguire served as a director of Nash Engineering while

serving on the board of managers for Nash Holdings from 2013, until the filing of the

bankruptcy petition.  See Compl. ¶ 24.  At the time of the Chubb settlement, all

defendants owed fiduciary duties to Nash Holdings' members.  See id. ¶ 43.  As

discussed, supra, see Section I.V.A.1., a memorandum dated January 16, 2020,

advised the directors of Nash Engineering that Chapter 7 bankruptcy presented the risk

that the bankruptcy Trustee would look for assets or sue Nash Engineering's insurers

and in turn the insurers would likely seek indemnification from Nash Engineering.  See

id. ¶ 76.  The memorandum further advised Nash Engineering that, if it pursues

bankruptcy, it should do so without cash available and after receiving releases from

insurers to prevent the Trustee's asset search.  See id.  In two emails sent during the

Chubb settlement negotiations in March 2020, Nordenson wrote that Nash

Engineering's objective since the sale of its ownership interest in Nash Elmo in 2004

has been to dissolve and liquidate its assets and to distribute proceeds to the Nash

family shareholders.  See id. ¶¶ 70-71.  The Trustee alleged that, by keeping Nash

Engineering in existence and continuing to process claims under available insurance

policies or settlement funds, the defendants prevented asbestos claimants from

discovering the transfers.  See id. ¶ 95.; see also e.g., id. ¶ 71 (March 27, 2020 email),

id. ¶ 76 (January 16, 2020 memorandum).  These allegations raise a reasonable

inference of a conflict of interest between the duties the defendants owed to Nash

Holding and the duties they owed to Nash Engineering, including its creditors due to its

alleged insolvency as discussed in Section IV.B., see, supra, at 27-28.

Therefore, the court concludes that the Trustee has plausibly alleged that the

defendants had a conflict of interest and that actions of Nordenson and Bly were

motivated, at least in part, by self-interest.  Accordingly, the court denies the Motion to

Dismiss all Counts on the ground that the Trustee has not adequately alleged conduct

that would rebut the business judgment rule.

## V.    CONCLUSION

For the reasons stated above, the court denies the defendants' Motion to Dismiss

(Doc. No. 23).

## SO ORDERED.

Dated at New Haven, Connecticut this 15th day of July 2024.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge